Shearnette ABRAMS, et al., Plaintiffs,

v.

KELSEY-SEYBOLD MEDICAL GROUP, INC., et al., Defendants.

No. CIV. A. H–96–1017.

United States District Court, S.D. Texas, Houston Division.

Nov. 18, 1997.

Anthony P. Griffin, Attorney at Law, Galveston, TX, for Plaintiffs.

Barbara L. Johnson, Wickliff & Hall, Houston, TX, David Parsons, Wilderman Harrold Allen & Dixon, Chicago, IL, for Defendants.

## MEMORANDUM AND OPINION

ROSENTHAL, District Judge.

Plaintiffs, present and former employees and unsuccessful job applicants of Kelsey–Seybold Clinic ("Kelsey–Seybold"), filed this putative class action against Kelsey–Seybold Medical Group, Inc., Kelsey–Seybold, Inc., and Caremark, Inc. Plaintiffs alleged discrimination in employment against African–American and Hispanic employees and applicants, in violation of Title VII of the Civil Rights Acts of 1964, as amended, 42 U.S.C. § 2000e; impairment of the right to enforce contracts as guaranteed under the Civil Rights Act of 1866, 42 U.S.C. § 1981; and intentional infliction of emotional distress under Texas state law. Plaintiffs sought an injunction against further discrimination; compensatory damages, including backpay and future damages; and punitive damages.

Following limited discovery, plaintiffs filed a motion for class certification. This court held an evidentiary hearing on the class certification motion on September 18, 1997. Both sides have filed briefs and deposition testimony and have submitted proposed findings of fact and conclusions of law. (Docket Entry Nos. 52, 55).

Based on a careful review of the pleadings, the motion for class certification, the parties' submissions, the evidence, the arguments of counsel, and the applicable law, this court DENIES the motion for class certification and enters the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

#### I. The Parties

Kelsey–Seybold Clinic is a multi-specialty outpatient clinic. During the period covered by plaintiffs' allegations, September 5, 1993 to the present, Kelsey–Seybold had approximately twenty clinics in the Houston area. During that period, Kelsey–Seybold Clinic was made up of two parts: 1) Kelsey–Seybold Medical Group, P.A. d/b/a Kelsey–Seybold Clinic; and 2) Kelsey–Seybold Management Division of Caremark, Inc. d/b/a Kelsey–Seybold Clinic. The physicians and technical employees at the clinics are employed by Kelsey–Seybold P.A., which is owned by the physicians. The administrative staff of the clinics are employed by the Kelsey–Seybold Management Division of Caremark, Inc., a wholly-owned subsidiary of Caremark International, Inc.

The twenty-two named plaintiffs are current and former African–American and Hispanic employees at five of the Houston-area clinics, and African–American applicants who were not hired by Kelsey–Seybold. Named plaintiffs James Dunn, Kimbralyn Profit, Mary Medel, and Julia Mills–Douglas allegedly applied for clerical, patient service representative, and technical service positions at Kelsey–Seybold. Plaintiffs Brian Moncriffe, Thomas Beasley, Joycelyn Dysart, Julia Mills–Douglas, Shearnette Abrahams, Elena Walker, Cecelia Bryzet, Marcia Williams, Robert Drew, Mary Medel, and Enrique Sirias sought promotion or transfer from their positions. The remaining named plaintiffs are employees alleging discrimination in wages and disparate conditions of employment.

In July 1994, two lawyers representing plaintiffs filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). In the complaint, they alleged

that "[s]ince September 5, 1993 and continuing through the present, Blacks and Hispanics as a class have been continuously subjected to unequal terms and conditions of employment ... denied transfers, denied wage increases, denied promotions, forced to resign and/or discharged." (Docket Entry No. 42, Ex. 1). The EEOC complaint contained no allegation of discrimination in hiring.[1] The EEOC issued a right to sue letter on October 10, 1995. Plaintiffs filed this suit on the same day. (Docket Entry No. 1).[2]

In their first amended complaint, plaintiffs sought class certification for "all current and former non-white employees, and non-white applicants [of Kelsey–Seybold] who are residents of several counties in Texas," including: all African–American and Hispanic employees of defendants who have been subjected to discriminatory conduct and conditions of employment during the period at issue; all African–American and Hispanic employees who applied for supervisory positions and/or promotions during their employment in the relevant time period; all African–American and Hispanic employees who were wrongfully terminated during the relevant time; and all African–American and Hispanic persons who applied for positions during the relevant time and were denied employment based on race/national origin. (Docket Entry No. 25, First Amended Complaint, pp. 2–3).

Following discovery relevant to the class issues, plaintiffs moved for certification. In their motion for class certification, plaintiffs sought to certify one "pattern or practice" class comprised of African–Americans and Hispanics who had been discriminated against by Kelsey–Seybold in the following areas: "wage rates"; "applicants"; "promotion/transfer"; and "conditions of employ-

ment." (Docket Entry No. 38, p. 9). The proposed class members consisted of clerical and administrative support personnel and applicants and, as to wage rates, included licensed vocational nurses.

At the class certification hearing, plaintiffs redefined the classes they sought to certify, as follows:

1) African-American applicants for clerical, patient service representative, and technical service representative positions in Kelsey–Seybold from 1993 to the present;

2) African-American employees seeking promotions and/or transfers from maintenance, clerical, and patient service representative positions from 1993 to the present; and

3) Hispanic employees seeking promotions and/or transfers from clerical and technical service representative positions from 1993 to the present.

(Docket Entry No. 51, Transcript of Class Certification Hearing, pp. 143–46).

In their Proposed Findings of Fact and Conclusions of Law, submitted after the class certification hearing, plaintiffs narrowed their request even further. Plaintiffs stated that they have "abandoned any attempted certification with respect to Hispanics in any given area." (Docket Entry No. 55, p. 17).

Plaintiffs currently seek certification for two classes:

1) African-American applicants for patient service representative and technical service representative positions in Kelsey–Seybold from 1993 to the present; and

2) African-American employees seeking promotions and/or transfers from maintenance, clerical, and patient service repre-

---

1. Charlotte Williams, one of the lawyers for the plaintiffs, testified at the class certification hearing that they sent two individuals complaining of discrimination in hiring decisions, Kimbralyn Profit and James Dunn, to the Department of Labor ("DOL"). Profit and Dunn did not go to DOL to complain until after this lawsuit was filed. (Plaintiffs' Exhibits 1 and 2). DOL in turn referred them to the EEOC. Williams testified as to her understanding that the two complainants referred by DOL to the EEOC were included in the EEOC's right to sue letter.

2. A group of 44 plaintiffs originally filed suit against Kelsey–Seybold in federal district court on September 15, 1994, asserting causes of action under 42 U.S.C. § 1981, § 1983, and various state law causes of action. In February 1995, the parties settled the claims of 11 plaintiffs. As part of an agreement made in connection with the claims of the remaining 33 plaintiffs, Kelsey–Seybold agreed to toll the statute of limitations on the plaintiffs' § 1981 claims for 60 days. The claims of the remaining 33 plaintiffs were dismissed without prejudice on August 11, 1995.

sentative positions from 1993 to the present.

Plaintiffs do not seek certification of any class involving alleged discrimination in wages, conditions of employment, or termination.

## II. The Proposed Applicant Class

### A. The Evidence as to Hiring Practices and Procedures

Kelsey–Seybold has used the same hiring process since at least 1992. Applicants for positions at any of the Houston-area clinics first applied at the human resources office on Fannin Street. Available jobs were listed on "job posting sheets" in the human resources office. A job posting sheet listed both minimum job qualifications and "job preferences." Kelsey–Seybold defined "job preferences" as capabilities desirable for a given job, but which could be supplied through training. The objective job qualifications and preferences for each position were written.

At the human resources office, applicants signed a sign-in log and filled out an application listing the positions for which they were applying. Applicants turned in the applications to the human resources receptionist. The receptionist forwarded the applications to "recruiters" in the human resources office. The recruiters preliminarily screened each application to determine whether the applicant met the minimum job qualifications for the desired positions. The recruiters "coded" each application to reflect whether the applicant met some or all of the qualifications and preferences. If the applicant did not meet the minimum job qualifications, the recruiters rejected the applicant.

If the applicant met the minimum qualifications, the recruiter forwarded the application to the appropriate "hiring authority." The hiring authority was the individual with the authority to make a specific hiring decision, typically the supervisor or manager of the department at a particular clinic. The individual hiring authority determined whether to interview an applicant for a position and then whether to hire the applicant. Interviews occurred at the individual clinics. If the hiring authority selected a particular applicant, the authority informed the recruiter at the human resources office, and the recruiter extended the formal employment offer.

Testimony at the class certification hearing showed that when an applicant signed in at the human resources office and filled out an application, the sign-in log and a sheet attached to the application contained spaces for information about race and sex (the "self-identification" sheet). The application itself did not identify the applicant's race or ethnicity. Kelsey–Seybold gathered this information because it was required to report each applicant's race and sex to the Office of Federal Contract Compliance Programs ("OFCCP") of the Department of Labor.

In June 1992, defendants entered into a four-year conciliation agreement with the OFCCP.[3] Under federal regulations and the conciliation agreement, Kelsey–Seybold was required to keep an applicant log, showing each applicant's name, race and sex, and the disposition of the application. Kelsey–Seybold procedures required the human resources office receptionist to detach the per-

---

**3.** The 1992 conciliation agreement set out reporting and audit requirements. The OFCCP undertook a "compliance review" of Kelsey–Seybold's employment practices on May 1, 1995. On July 13, 1995, the OFCCP issued a "Notice of Violation" to Kelsey–Seybold, finding that Kelsey–Seybold had violated several federal employment practice regulations primarily relating to: failure to list each job title as it appears on payroll records ranked from lowest paid to highest paid within each department, in violation of 41 C.F.R. § 60–2.11(a); failure to submit acceptable job group, availability, and utilization analyses, in violation of 41 C.F.R. § 60–2.11(b); failure to submit adequate data to allow for a meaningful analysis of personnel activity, in violation of 41

C.F.R. § 60–2.12(m); failure to develop and execute adequate action-oriented programs, in violation of 41 C.F.R. § 60–2.13(f); and failure to design and implement an adequate internal audit and reporting system to measure the effectiveness of the total program, in violation of 41 C.F.R. § 60–2.13(g). On August 30, 1995, Kelsey–Seybold and the OFCCP entered into a conciliation agreement requiring Kelsey–Seybold to report, among other things, its progress toward the correction of the violations through August 1997. On September 2, 1997, the Department of Labor notified Kelsey–Seybold that Kelsey–Seybold had fully satisfied the reporting requirements of the conciliation agreement. (Defendants' Exhibit 5).

forated self-identification sheet from a completed application, file the sheet separately in the human resources office, and send the application without the self-identification sheet to a human resources recruiter for preliminary review. During at least some of the years at issue, Kelsey–Seybold's human resources receptionist was Beverly Hearn, who is African–American.

Plaintiffs presented evidence at the class certification hearing that in some cases, the self-identification sheet was not removed before the application was forwarded. There was no allegation or credible evidence of a policy or practice that the demographic information was left on the applications of African–Americans in order to screen applicants by their race.

The evidence presented showed that the individual hiring authorities were the hiring decision makers. No one in the human resources department had hiring authority for positions other than those in the human resources department itself. The hiring process was decentralized.

Although the managers or supervisors of the specific departments at each clinic made hiring decisions within their own departments, Kelsey–Seybold did not allow those decisions to be made on an entirely subjective basis. Instead, Kelsey–Seybold had written, objective, uniform requirements for each position. Plaintiffs did not allege, and presented no evidence showing, that these written job requirements were facially neutral but unlawful employment practices that, as applied, had a disparate impact on African–American applicants.

**B. The Representative Plaintiffs**

The named plaintiffs who seek to act as representatives of the putative application class, and the allegations and evidence as to their individual circumstances, are set out below.

1. *Julia Mills–Douglas*

Mills-Douglas did not testify at the certification hearing. In their first amended complaint, plaintiffs alleged that Mills–Douglas was an African–American patient service representative, but did not allege that Mills–Douglas was denied a job at Kelsey–Seybold. Plaintiffs alleged that Mills–Douglas was hired to be an assistant to an African–American manager, and that after this manager was terminated, Mills–Douglas was "not given the position she was hired for but a lower position instead." (Docket Entry No. 25, ¶ 65, p. 16). Plaintiffs also alleged that Mills–Douglas resigned after she was arrested on the job for hindering the apprehension of a felon. The allegations as to Mills–Douglas pertain either to failure to promote class allegations or to the discriminatory conditions of employment allegations. Mills–Douglas is not a proper representative plaintiff for an applicant class.

2. *Kimbralyn Profit*

Profit did not testify at the certification hearing. In their first amended complaint, plaintiffs alleged that Profit, an African–American, applied on September 13, 1994 for the positions of medical records clerk, appointment representative, and file clerk. On September 26, 1994, she received a postcard telling her that the position had been filled. Plaintiffs alleged that the positions of appointment representative and file clerk remained open. (Docket Entry No. 25, ¶ 72, p. 18).

3. *James Dunn*

Dunn, an African–American, testified at the class certification hearing. Dunn has a Bachelor of Science degree in technical writing and a Master of Arts degree in English literature. Dunn testified that he first applied for a job with Kelsey–Seybold at the human resources office in January 1995 and again in March 1995. Dunn's written application shows that he actually applied in September 1994. (Defendants' Exhibit 12).

In September 1994, Dunn applied for business analyst, patient services representative, and medical analyst positions. Dunn was not hired for any of these positions. Dunn did not know what the qualifications were for the jobs he sought, or that two of the positions

were filled by minority applicants, one of whom was an African–American female.[4]

Dunn testified that he believed that the application process was biased because the sign-in sheets and a form attached to the application had spaces for the applicant to identify his or her race and sex. Dunn testified that he did not know that the self-identification form requiring him to list his race was required by the DOL and EEOC. He did not know if the self-identification form was seen by anyone at Kelsey–Seybold other than the human resources receptionist. Plaintiffs presented no allegation or evidence, and this court does not find, that the self-identification form remained attached to Dunn's application when it was reviewed by a recruiter or a hiring authority.

### C. The Statistical Evidence as to Hiring

Plaintiffs' statistical evidence consists primarily of data that Kelsey–Seybold submitted to the OFCCP as part of the 1992 conciliation agreement. Plaintiffs had the data reviewed by Dr. Laura Myers, an associate professor of criminal justice at Sam Houston State University, who testified for plaintiffs as an expert in statistics. Dr. Myers has no experience with the format or substance of reports required by the OFCCP or EEOC.[5] Dr. Myers has so little relevant expertise and experience that defendants challenged her ability even to review the reports at issue.

Dr. Myers received her doctorate degree in criminology. Dr. Myers' teaching, research, writing, and expert witness experience in statistical analysis has occurred in law enforcement and correctional institution occupations. Dr. Myers has never published an article, taught a class, or given a presentation relating to statistical analysis of private employment practices. Before her work in this case, Dr. Myers had never analyzed the hiring statistics of a private employer or assessed employment data provided to the OFCCP.

Rule 702 of the Federal Rules of Evidence provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Kelsey-Seybold challenged Dr. Myers' qualifications as an expert, arguing that she did not have the knowledge, skill, experience, training, or education to interpret and offer an opinion with respect to the OFCCP data. Plaintiffs asked Dr. Myers to read, without analysis, the applicant flow data that Kelsey–Seybold had reported to the OFCCP. This court allowed her testimony for that limited purpose.

The applicant data, in relevant part, compared the percentage of minorities hired for a particular job category with the percentage of nonminorities hired for the same job category. Plaintiffs' Exhibit 5 covered January 1, 1993 to December 31, 1993; Exhibit 13 covered July 1, 1995 to June 30, 1996. For these periods, the exhibits reflected the number of "actions," which meant the number of hires; the "number of employees in a job category," which meant the number of applicants in the applicant pool for a given job; the "percentage of actions," which meant the percentage of those hired in a given racial or ethnic group; and the "percentage of total employees," which meant the percentage of the total applicant pool in that racial or ethnic group. The reports then compared the selection rates of one racial or ethnic group to another group.[6] A difference in selection

---

**4.** The persons hired for two of the positions for which Dunn applied were Jocelyn Campos, an Asian/Pacific Islander; and Mary Simpson, an African–American.

**5.** Defendants offered George Phares as both an expert in interpreting employment statistics and as a fact witness, in that he prepares affirmative action plans and prepared the OFCCP reports on which plaintiffs based their statistical case.

Plaintiffs did not challenge Mr. Phares as an expert.

**6.** For example, the report for physician hiring in 1993 showed that 26 of 40 nonminorities were hired, and 16 of 21 minorities were hired. (Plaintiffs' Exhibit 5, p. 1).

rate between two groups of more than 20 percent, in a given category, was reported as an "adverse impact."

The 1993 data revealed an "adverse impact" in African–American hiring in eleven job categories; the July 1, 1995 to June 30, 1996 data showed an "adverse impact" in hiring in nine categories.

Dr. Myers offered as a conclusion that Kelsey–Seybold's reported data showed that while 43 percent of all Kelsey–Seybold applicants were minorities, only 3.9 percent of those hired were African–American. Dr. Myers did not state the period that these figures encompassed, and did not identify the documents that contained these figures.[7] This conclusion is entitled to no weight. Dr. Myers incorrectly assumed that the applicant flow data was comprised of "qualified" applicants and employees. In fact, the applicant flow data was "unrefined," in that it did not take into account the qualifications of applicants and employees for particular job categories.[8] In addition, the hiring data was inaccurate to the extent that it did not adjust for an applicant that applied for multiple jobs within the same job group at Kelsey–Seybold. One such applicant would appear as several applicants. Moreover, some applicants interviewed for a job in one job category and were hired for a job in another job category; occasionally, an applicant's name was not removed from the original job category, which also artificially inflated the application numbers. Dr. Myers' conclusion is also inconsistent with data that showed that as of June 30, 1994, Kelsey–Seybold had 43.7 percent minority employment in all job categories combined. George Phares testified that that figure exceeded the minority availability rate. (Docket Entry No. 51, Transcript of Class Certification Hearing, p. 196).

█ The statistical data, unadjusted to reflect the qualifications of the applicants, is not probative of the presence of a classwide discriminatory practice or policy in hiring. *See Anderson v. Douglas & Lomason Co.,* 26 F.3d 1277, 1286 (5th Cir.1994); *EEOC v. Olson's Dairy Queens, Inc.,* 989 F.2d 165, 168 (5th Cir.1993); *Carroll v. Sears, Roebuck & Co.,* 708 F.2d 183, 192 (5th Cir.1983).

## III. The Proposed Discriminatory Transfers and Promotions Class

### A. The Evidence as to Transfer and Promotions Practices

Kelsey-Seybold defines a "transfer" as a lateral move with no salary increase; a "promotion" includes an increase in salary. Applications for a transfer or promotion to a posted vacant position are submitted to the human resources department through a transfer request form. The human resources department determines whether the applicant meets the minimum objective qualifications for the position sought. The transfer/promotion applicant must meet written transfer guidelines. These objective guidelines include the requirement that the applicant have been in his or her current position for at least six months, unless the applicant was an "on-call" employee; must meet the minimum requirements of the position sought; and must have no "counseling" recorded within the past six months.

If the applicant does not meet these minimum qualifications, the application is rejected by the human resources department. If the applicant meets the minimum qualifications, his or her application is forwarded to the appropriate manager or supervisor, who makes a hiring decision based on the employee's personnel file, consultation with the employee's current manager, and possibly an interview. Transfer/promotions decisions, like hiring decisions, are made by the manager or supervisor of the department involved.

---

7. Dr. Myers stated only that the 43 percent figure came from "one of the compliance documents." (Docket Entry No. 51, Transcript of Class Certification Hearing, p. 47).

8. Plaintiffs also submitted reports showing the names of Kelsey–Seybold applicants from July 1, 1995 to June 30, 1996, listing the applicant's race, sex, job categories and titles applied for, and whether the applicant was hired (Plaintiffs' Exhibit 10); and a chart listing new hires according to job category, showing total number of new hires from July 1, 1995 to June 30, 1996, and the percentage of new hires for a particular job category by race and sex. (Plaintiffs' Exhibit 11). None of this data was refined to account for an applicant's qualifications for the job category or title.

Each department at each clinic makes its own promotion and transfer decisions.

Kelsey-Seybold also maintains a list of "on-call" employees, who do not work on a daily basis, but are called to work when the full-time regular staff is inadequate. The on-call list was used for support positions such as patient services representative, nurses' aide, clerical worker, and warehouse laborer.

Plaintiffs presented testimony from Pamela Jones Wilson, who was the on-call staffing supervisor from January 1992 to September 1992.[9] Wilson testified that she was hired to increase the use of the on-call employee pool. The on-call list contained approximately 400 names, approximately half of whom were African–American. Wilson testified that some applicants who met the minimum qualifications for a position but were not hired for a full-time regular job were routed to the on-call department for consideration. Wilson testified that the on-call list was "underused" because some individual managers preferred to use particular on-call employees with whom the managers were familiar, rather than use the general pool. Wilson stated that the on-call personnel regularly called by managers who bypassed the on-call list were primarily white.

Wilson testified that if she sent an on-call employee to a department whose managers did not customarily rely on the on-call list, that employee would often be rejected, more often if that employee was African–American. Some of the managers' stated grounds for rejection were that the African–American on-call employee sent "didn't fit in" or, as to one dark-skinned woman, that she "looked dirty." If the on-call employee was white, that employee would often be kept in the

department on a regular basis. Wilson also testified that Mary Jackson, a human resources recruiter who is herself African–American, told Wilson not to send African–American on-call employees to particular supervisors, such as JoAnn Walton in Managed Health Care and Jean Featheree in Administration. (Docket Entry No. 51, Transcript of Class Certification Hearing, p. 129). Jackson denied making this statement. (*Id.*, p. 231).

## B. The Representative Plaintiffs

At the certification hearing, plaintiffs identified the representative plaintiffs for the proposed transfer/promotions class of African–American employees as Joycelyn Dysart, Brian Moncriffe, Thomas Beasley, Julia Mills–Douglas, Shearnette Abrahams, Cecelia Berzat, Elena Walker, Marcia Williams, and Robert Drew.[10]

### 1. Joycelyn Dysart

Dysart testified at the class certification hearing. Before working for Kelsey–Seybold, Dysart was employed by a temporary service called Prostaff. In February 1992, Prostaff placed Dysart in a full-time, but temporary, administrative secretary position at Kelsey–Seybold. Dysart applied for the position on a permanent basis in May 1992. Plaintiffs alleged that Dysart's supervisor, Jean Featheree, told Dysart that she did not "fit" the administrative secretary position, although Featheree would recommend her for other positions in Kelsey–Seybold. At the hearing, Dysart testified that when she applied for the permanent administrative secretary position in May 1992, she was told that the temporary job was coming to an end

---

**9.** Wilson was a plaintiff in the earlier lawsuit brought against Kelsey–Seybold.

**10.** In their proposed findings of fact and conclusions of law, plaintiffs also listed two Hispanic employees, Enrique Sirias and Mary Medel, as representative plaintiffs of a class of minorities discriminated against with respect to promotions and transfers. (Docket Entry No. 55, p. 4). At the class certification hearing, plaintiffs also identified Sirias and Medel as representative plaintiffs for the class of Hispanic employees discriminatorily denied promotion and transfer opportunities. However, plaintiffs have abandoned their efforts to certify a class of Hispanic

employees. (*Id.*, p. 17). The court also notes that in her deposition, Medel did not assert claims of discriminatory denial of transfer or promotion; her claims related to job termination, denial of benefits, demotion, and discriminatory conditions of employment. (Defendants' Exhibit 11, Deposition of Mary Medel, p. 13). In his deposition, Sirias complained of discriminatory job termination and denial of promotion; however, Sirias admitted that he had never applied for a promotion. In Sirias' words, he never applied for a promotion because "I never thought I had a chance." (Defendants' Exhibit 11, Deposition of Enrique Sirias, p. 11).

and that she should reapply as an on-call employee. When Dysart did so, she was hired as an on-call medical secretary rather than as an on-call administrative secretary. Dysart testified that she believed that the administrative secretary job remained open.

In late July 1992, Dysart again applied to transfer to a permanent administrative secretary position. In August 1992, Kelsey–Seybold hired Dysart as a full-time employee, but as a medical secretary rather than an administrative secretary. Dysart alleged that the denial of her August 1992 application for a regular administrative secretary position was discriminatory. At her deposition, however, Dysart denied that Kelsey–Seybold's rejection of her August 1992 transfer application to administrative secretary was based on discrimination.[11]

In November 1993, Dysart requested a transfer from her position as a medical secretary to become an administrative secretary in the health services department. Dysart did not receive the transfer; she did not know who filled the position. Dysart twice took a typing test and scored below the minimum required for the position of administrative secretary both times.

### 2. Thomas Beasley

Plaintiffs submitted excerpts of the deposition testimony of Beasley, an African–American mail clerk. Plaintiffs' first amended complaint alleged that Beasley was told that he did not receive a promotion because the person who previously held the position he sought was an African–American male with performance problems. (Docket Entry No. 25, ¶¶ 50–51, p. 13). In his deposition, Beasley testified that he was discriminatorily denied transfers to two different positions in favor of less-qualified Hispanic males. (Defendants' Exhibit 11, Deposition of Thomas Beasley, pp. 16–22, 24).

### 3. Robert Drew

Plaintiffs submitted excerpts of Drew's deposition testimony. Drew testified that he was employed in the claims department and was promised a promotion to provider service representative. After several months passed without a promotion, Drew "became tired of waiting and resigned." (Defendants' Exhibit 11, Deposition of Robert Drew, p. 10). In plaintiffs' first amended complaint, they allege that two weeks after Drew resigned, "a majority employee with lesser skills and qualifications was placed in the position." (Docket Entry No. 25, ¶ 81, p. 21).

### 4. Brian Moncriffe

Plaintiffs alleged that Moncriffe was an African–American maintenance employee and that he "encountered obstacles in [his] bid to move up in the system." (Docket Entry No. 25, ¶ 50, p. 13).

### 5. Shearnette Abrahams

Plaintiffs alleged that Abrahams, a clerical employee, witnessed her supervisor, who was African–American, "being set-up and eventually terminated on pretextual allegations," then replaced by a white employee. (Docket Entry No. 25, ¶ 53, pp. 13–14). Plaintiffs also alleged that this supervisor had appointed Abrahams to a temporary administrative assistant position. When the supervisor was terminated, Abrahams was removed from the position. (Docket Entry No. 25, ¶ 66, p. 17). Abrahams later resigned due to alleged harassment. (Docket Entry No. 25, ¶ 136, p. 38).

### 6. Cecelia Bryzet

Bryzet was a lab assistant who worked for Kelsey–Seybold for ten years. Plaintiffs' amended complaint included allegations that Bryzet was transferred to a different clinic and denied a raise by her supervisors, despite having received excellent evaluations. Plaintiffs also alleged racially discriminatory disparate discipline, disparate wages, and

---

11. Dysart's deposition included the following testimony:

Q: And with respect to this transfer request form and your going from on-call to permanent status in the Hematology Department as a medical secretary, you have no claim of race discrimination. Correct?

A: Yes.

(Defendants' Exhibit 11, Deposition of Joycelyn Dysart, p. 42).

termination with respect to Bryzet. (Docket Entry No. 25, ¶ 84, pp. 22–23).

### 7. *Marcia Williams*

Williams was an LVN. Plaintiffs alleged that she received lower pay than her white counterparts. There is no allegation or evidence as to denials of promotion or transfer as to Williams. (Docket Entry No. 25, ¶ 96, p. 27).

### 8. *Julia Mills–Douglas*

Plaintiffs alleged that Mills–Douglas, a patient services representative, was hired by an African–American supervisor to be his assistant. When the supervisor was terminated, Mills–Douglas was not given the position she was hired for, but a lower position. (Docket Entry No. 25, ¶ 65, p. 16).

### 9. *Elena Walker*

Walker was an on-call employee for four months. Plaintiffs alleged that Walker was "locked" into an on-call position, then terminated for taking a week off. Plaintiffs alleged that her termination was racially motivated and that Walker's replacement, a majority employee, received higher compensation, although she had less experience. (Docket Entry No. 25, ¶ 95, pp. 26–27).

### C. Plaintiffs' Statistical Evidence with Respect to Transfers/Promotions

Plaintiffs submitted statistics purporting to show a classwide pattern or practice of discrimination in transfers and promotions. Kelsey–Seybold compiled the data for the OFCCP as part of the conciliation agreement. One set of data compared the percentage of employees in minority racial or ethnic groups awarded promotions in a particular job category with the percentage of non-minorities promoted out of that job category in 1993 (Plaintiffs' Exhibit 6); an "adverse impact" was indicated if the minority group's percentage of promotions was less than 80 percent of the percentage of nonminority promotions. Plaintiffs offered a similar data set for the period of July 1, 1995 to June 30, 1996. (Plaintiffs' Exhibit 14). The 1993 data revealed an "adverse impact" in African–American promotions in three of the job categories; the July 1, 1995 to June 30, 1996 data revealed an "adverse impact" in ten job categories. Plaintiffs also offered a chart listing promotions according to job category, showing total number of promotions from July 1, 1995 to June 30, 1996, and the percentage of promotions for a particular job category by race and sex. (Plaintiffs' Exhibit 12).

■ Like the OFCCP hiring data, the promotions data was not refined to reflect those applicants who met the eligibility requirements for promotion or transfer. Rather, the reports compared "job group employees," which meant the number of incumbents in that job category at the time, with those actually promoted. The statistics made no attempt to distinguish between those incumbents who were qualified for a promotion and those who were not. They are not probative of the presence of a classwide policy or practice of discrimination in promotions.

## CONCLUSIONS OF LAW

In order to certify a class, plaintiffs must establish that the proposed class meets the requirements of F.R.C.P. 23(a) and the requirements of at least one of the subsections of F.R.C.P. 23(b). *Castano v. American Tobacco Co.*, 84 F.3d 734, 750 (5th Cir.1996).

A court must first inquire into whether the proposed class meets the four preliminary requirements of Rule 23(a):

> **(a) Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a).

Plaintiffs seek certification under Rule 23(b)(2), which provides that a class action is proper if "the party opposing the class has acted or refused to act on grounds generally

applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." FED. R. CIV. P. 23(b)(2).

 The burden of showing that the requirements for class certification have been met rests with the plaintiffs. *Castano,* 84 F.3d at 740; *Horton v. Goose Creek Indep. Sch. Dist.,* 690 F.2d 470, 483 (5th Cir.1982). The plaintiffs' allegations are taken as true. *Blackie v. Barrack,* 524 F.2d 891, 901 n. 17 (9th Cir.1975); *Griffin v. Home Depot, Inc.,* 168 F.R.D. 187, 189 (E.D.La.1996). The court does not examine the merits of the case. *Eisen v.. Carlisle & Jacquelin,* 417 U.S. 156, 176–78, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974).

## I. Rule 23(a) Requirements

### A. Numerosity

 Rule 23(a)(1) requires the movant to show that "the class is so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). The central issue in the numerosity requirement is whether joinder of the class members would be impracticable. *Garcia v. Gloor,* 618 F.2d 264, 267 (5th Cir.1980). "Practicability of joinder depends on the size of the class, ease of identifying its members and determining their addresses, facility of making service on them if joined and their geographic dispersion." *Id; see also General Tel. Co. of the Northwest, Inc. v. EEOC,* 446 U.S. 318, 321–23, 100 S.Ct. 1698, 1702, 64 L.Ed.2d 319 (1980) (noting that a class of fifteen people is insufficient to prove numerosity); *Andrews v. Bechtel Power Corp.,* 780 F.2d 124, 132 (1st Cir.1985) (finding joinder practicable where all potential class members lived in southeast Massachusetts). Speculation that a class is numerous is insufficient to prove numerosity. *See Fleming v. Travenol Labs., Inc.,* 707 F.2d 829, 833 (5th Cir.1983). Numerosity must be based on specific estimates of the size of the class and the impracticability of joinder. *General Tel. Co. of the Northwest,* 446 U.S. at 321–23, 100 S.Ct. at 1702.

 With respect to the transfer/promotions class, plaintiffs have failed to introduce any evidence of numerosity, and have only speculated that numerosity has been met. Plaintiffs have not estimated the number of African–American employees who were denied transfers and/or promotions for which they were qualified; or provided data confirming their existence; determined the geographical proximity of the proposed class members; or explained any difficulties inherent in joining the proposed class members. Plaintiffs have failed to show that the numerosity requirement of Rule 23(a)(1) has been met with respect to the transfer/promotion class. However, the denial of the certification motion does not rest on the absence of numerosity.

### B. Typicality and Commonality

 The class members' claims must also meet the typicality and commonality requirements of Rule 23(a)(2) and 23(a)(3). Typicality requires plaintiffs to show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). Commonality requires plaintiffs to demonstrate that there is at least one question of law or fact common to the class. FED. R. CIV. P. 23(a)(2). "Both [typicality and commonality] serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *General Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 2370 n. 13, 72 L.Ed.2d 740 (1982). Under the typicality and commonality requirements, plaintiffs must identify a class of people who have been subjected to the same or similar treatment as the class representatives and whose claims challenge the same employment practice. *See Wagner v. Taylor,* 836 F.2d 578, 591 (D.C.Cir.1987) ("[T]he court must consider whether [the class representative] suffered injury from a specific discriminatory promotional practice of the employer in the same manner that the members of the proposed class did, and whether [the class repre-

sentative] and the class members were injured in the same fashion.").

▮ It is settled law that a person of a given racial group may not represent other members of the group merely because they were all subjected to some type of discrimination by a common employer. Because of the individual nature of the harms alleged in disparate treatment claims, a court must scrutinize proposed disparate treatment classes for the existence of typicality and commonality. In *Falcon v. General Telephone Co. of Southwest,* 626 F.2d 369 (5th Cir.1980), the Supreme Court made it clear that:

> allegation[s] that [racial] discrimination has occurred neither determines whether a class action may be maintained in accordance with Rule 23 nor defines the class that may be certified. Conceptually, there is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims.

*Falcon,* 457 U.S. at 157, 102 S.Ct. at 2370.

In *Falcon,* the Supreme Court emphasized that a Title VII employment discrimination case might be susceptible to a class encompassing both applicants and incumbent employees "[i]f [the employer] used a biased testing procedure to evaluate both applicants for employment and incumbent employees," or if there was "[s]ignificant proof that an employer operated under a general policy of discrimination ... [that] manifested itself in hiring and promotion practices in the same general fashion, such as through entirely subjective decisionmaking processes." *Id.* at 159 n. 15, 102 S.Ct. at 2371 n. 15.

▮ In the cases decided since *Falcon,* the courts have made it clear that in cases alleging classwide disparate treatment in particular employment actions, plaintiffs must show a company-wide policy or prac-

tice, beyond individualized claims of discrimination. *See Pinkard v. Pullman–Standard,* 678 F.2d 1211, 1215 (5th Cir.1982) (noting that "[i]t is well settled that, where a case requires detailed investigations of the circumstances surrounding the claims of individual class members, that case does not lend itself to treatment as a class action"); *Trevino v. Holly Sugar Corp.,* 811 F.2d 896, 905 (5th Cir.1987) (affirming the district court's denial of certification of a promotions class because the employer's promotion criteria included consideration of an employee's accrued seniority and job skills, factors which require "individualized proof"). A class may not be based on discrimination occurring in different departments, involving different decision makers. *See, e.g., Brown v. Delta Air Lines, Inc.,* 522 F.Supp. 1218, 1221 n. 1 (S.D.Tex.1980), *aff'd,* 673 F.2d 1325 (5th Cir. 1982); *Webb v. Westinghouse Elec. Corp.,* 78 F.R.D. 645, 651 (E.D.Pa.1978); *see also Wynn v. Dixieland Food Stores, Inc.,* 125 F.R.D. 696, 700 (M.D.Ala.1989) (finding commonality in a discriminatory terminations case because the plaintiffs alleged a "corporate-wide" pattern of discrimination and "individual store managers d[id] not have the authority to terminate full-time employees").

In this case, plaintiffs have abandoned their initial efforts to certify a single "across the board" class encompassing all alleged types of discrimination against Kelsey–Seybold. However, plaintiffs have not met the requirements of commonality and typicality even as to the limited applicant and transfer/promotion classes they assert.

## II. The Proposed Applicant Class

### A. The Issue of Exhaustion

▮ Before bringing a claim under Title VII, a plaintiff must exhaust administrative remedies through the EEOC by filing a "charge" of discrimination describing the alleged discriminatory conduct. 42 U.S.C. § 2000e–5(a),(e). A court may only hear allegations of discrimination that were included within the "scope" of the EEOC charge. *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 460–61 (5th Cir.1970). In *Sanchez,* the Fifth Circuit held that "the 'scope' of the judicial complaint is limited to the 'scope' of

the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Id.* at 466.

The *Sanchez* issue arises when plaintiffs assert specific discriminatory conduct in the EEOC charge, such as discrimination in hiring, but then assert Title VII claims based on different or additional discriminatory acts, such as discrimination in promotions. *See, e.g., Falcon v. General Tel. Co. of the Southwest,* 626 F.2d 369, 377 (5th Cir.1980), *rev'd on other grounds,* 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (permitting a plaintiff to assert a Title VII claim based on hiring discrimination when the EEOC charge asserted discrimination in promotions, because "an investigation of promotional practices almost inevitably leads to a study of hiring practices, and the EEOC did investigate both areas").

In the present case, the EEOC charge plaintiffs filed did not include an allegation of hiring discrimination. Instead, the EEOC charge alleged that minorities had been subjected to "unequal terms and conditions of employment . . ., denied transfers, denied wage increases, denied promotions, forced to resign and/or discharged." (Docket Entry No. 42, Ex. 1). The *Falcon* court interpreted *Sanchez* to allow allegations of discriminatory hiring that were not explicitly included in the EEOC charge, based in part on the fact that the EEOC actually investigated the employer's hiring practices. One district court has distinguished *Sanchez* and found no jurisdiction over hiring discrimination allegations when they were not included in the EEOC charge and there was no evidence that the EEOC investigated the employer's hiring practices. *See McCraw v. Gulf Printing Co.,* 1982 WL 297, at *2 (S.D.Tex. Feb. 16, 1982); *see also Dupree v. Hertz Corp.,* 419 F.Supp. 764, 769 (E.D.Pa.1976); *cf. Chester v. American Tel. & Tel. Co.,* 907 F.Supp. 982, 987 (N.D.Tex.1994) (citing cases holding that failure to transfer claims and failure to hire claims are not "reasonably related" to a discriminatory discharge claim), *aff'd,* 68 F.3d 470 (5th Cir.1995).

The parties have not made clear whether the EEOC investigated Kelsey–Seybold's hiring practices based on the charge submitted. It is unclear that any named plaintiff alleging a failure to hire had ever complained to the EEOC before plaintiffs filed suit. However, this court's denial of class certification rests primarily on the lack of typicality and commonality in the proposed classes, and this court does not reach the question of whether plaintiffs' hiring claims may properly be considered under *Sanchez's* definition of the "scope" of the EEOC charge.

## B. The Failure to Meet the Typicality and Commonality Requirements

■ Plaintiffs' allegations, as detailed in the amended complaint, portray individual claims of discrimination against African–American clerical/administrative support applicants who were not hired. These claims do not present common questions or fact or law sufficient to justify class action treatment. Resolution of the merits of the claims will require independent consideration of each plaintiff's qualifications for the positions sought, as well as the qualifications and work history of those nonminority employees hired when African–American applicants were rejected. *See Merrill v. Southern Methodist Univ.,* 806 F.2d 600, 608 (5th Cir.1986).

■ Plaintiffs' pleadings do not identify a single discriminatory hiring practice. Two of the three representative plaintiffs allege that they applied but were rejected without an interview.[12] The testimony at the hearing showed that applicants who met minimum job requirements, which plaintiffs did not contend to be discriminatory, were then considered by hiring authorities at the individual clinics, and that the decisions were made by these individuals. The process is not centralized. Typicality and commonality are also lacking because the allegations and evidence show that the members of the purported class were not subjected to the same decision making authority. *See Bradford v. Sears, Roebuck & Co.,* 673 F.2d 792, 795 (5th Cir. 1982) (reversing certification of an across-

12. The third named plaintiff identified as a representative for this class, Julia Mills–Douglas, was hired and is not a proper representative for this purported class. (Docket Entry No. 25, ¶ 65, p. 16).

the-board class in part because the employment practices complained of occurred in different retail stores where "[d]ifferent staffs supervise the stores and oversee the personnel decisions"); *Allen v. City of Chicago,* 828 F.Supp. 543, 552 (N.D.Ill.1993) (finding that commonality did not exist in a disparate treatment class in which the claims "must be viewed in light of the employment conditions within each city department, which individually determined which employees would be affected by the reorganization"); *cf. Holsey v. Armour & Co.,* 743 F.2d 199, 216 (4th Cir.1984)· (denying certification of a hiring and promotions class in part because the hiring and promotions decisions were not made by the same supervisors).

Plaintiffs did not allege, but argued at the certification hearing, that Kelsey–Seybold used a specific discriminatory hiring practice, in which African–American applicants who met the posted job requirements but were not hired as permanent or full-time employees were placed on the "on-call" list. This allegation is more appropriately considered with respect to the proposed transfer/promotion class. If examined as part of the applicant class, it is clear that resolution of the merits of these claims will also require an examination of the individual decisions made by the hiring authorities at the specific departments in each clinic, and a comparison of the qualifications of those placed on the on-call list with those hired for the "regular" positions.

■ Plaintiffs attempt to overcome the presence of individualized claims of discrimination in hiring by arguing that the requirement that applicants identify their race and sex itself is a discriminatory practice of general application. Plaintiffs assert that this hiring requirement can be properly analyzed under a disparate impact theory and can be the basis of common and typical claims. Plaintiffs argue that the testimony showed a practice of having the human resources office receptionist leave the demographic information sheets attached to the applications of African–American applicants before those applications were forwarded to the human resources · recruiters and then to the hiring authorities at the clinics. As a result, plain-

tiffs argue, African–American applicants were either not hired at all or, if qualified but not hired, were placed on the on-call list. (Docket Entry No. 55, pp. 22–23).

The only allegation in the complaint to support this theory is the allegation that James Dunn was required to list his race and sex when he applied for a job. The testimony at the class certification hearing was that Kelsey–Seybold was required to have applicants record their race and sex to meet the OFCCP's reporting standards. There was no testimony that the self-identification sheets were regularly or routinely left attached to applications filed by African–Americans to be seen by recruiters or by the individual hiring authorities. The testimony and evidence at the class certification hearing does not permit this court to find that there was a pattern or practice of leaving the required self-identification sheet attached to the applications to permit screening by race, so as to provide a basis for meeting the Rule 23(a)(2) and (a)(3) requirements.

■ Plaintiffs' disparate impact argument does not overcome the essentially individualized nature of the claims plaintiffs assert. The Fifth Circuit has held that employment practices that depend on an employer's discretion are not "facially neutral" procedures that may be analyzed under a disparate impact model. In *Pouncy v. Prudential Ins. Co.,* 668 F.2d 795 (5th Cir. 1982), the Fifth Circuit held that "[t]he disparate impact model applies only when an employer has instituted a specific procedure, usually a selection criterion for employment, that can be shown to have a causal connection to a class based imbalance in the work force." *Id.* at 800. However, a classification practice that depends on the employer's discretion is not included in this category. Employment practices, such as a failure to post job openings, that result in the under representation of the protected group in those actually hired or promoted, must be analyzed under· the discriminatory treatment model, which requires proof of discriminatory intent. *Id.* at 801; *see also Watson v. Ft. Worth Bank & Trust,* 798 F.2d 791, 797 (5th Cir.1986), *rev'd on other grounds,* 487 U.S. 977, 108 S.Ct. 2777, 101

L.Ed.2d 827 (1988); *Carpenter v. Stephen F. Austin State Univ.*, 706 F.2d 608, 620 (5th Cir.1983); *Pegues v. Mississippi State Employment Serv.*, 699 F.2d 760 (5th Cir. 1983). In the present case, the challenged classification practice must be analyzed under the disparate treatment model. Plaintiffs do not argue that Kelsey–Seybold utilized a facially neutral practice, but rather that there were practices that were discriminatorily applied, depending on the employer's discretion.[13] Plaintiffs have not alleged or shown a class-wide discriminatory procedure or policy that is properly analyzed under the disparate impact model, but rather individualized claims of discriminatory treatment.

■ Plaintiffs alleging company-wide employment discrimination rather than individual claims may also show that the challenged decisions were based entirely on subjective discretion exercised in a discriminatory manner, to establish typicality and commonality.[14] *See Falcon*, 457 U.S. at 159 n. 15, 102 S.Ct. at 2371 n. 15; *Richardson v. Byrd*, 709 F.2d 1016, 1020 (5th Cir.1983) (finding that a department's lack of objective or written guidelines for transfer or promotion, and its use of totally subjective factors by a core group of supervisors, constituted a subjective decision making process); *Carpenter*, 706 F.2d at 617 (finding typicality and commonality where an employer "utilized subjective job assignment procedures that resulted in placement of women, as well as blacks, according to stereotyped views of job qualifications"); *Lilly v. Harris–Teeter Supermarket*, 720 F.2d 326, 333 (4th Cir.1983) (finding commonality where the class representative alleged a "practice of disparate treatment in the exercise of unbridled discretion"); *Ivy v. Meridian Coca–Cola Bottling Co.*, 108 F.R.D. 118, 123 (S.D.Miss.1985) (finding the existence of a subjective decision making process where "the court is confronted with a

situation where there are no established operating procedures or objective personnel policies in place at all").

■ In the present case, plaintiffs do not plead or show evidence of entirely subjective hiring decisions. To the contrary, Kelsey–Seybold used written, objective job qualifications and identified "preferences" for each posted job vacancy. Plaintiffs have introduced no evidence showing that individual hiring authorities used only their "unfettered discretion" in hiring applicants. *Appleton v. Deloitte & Touche L.L.P.*, 168 F.R.D. 221, 228 (M.D.Tenn.1996). Where, as here, there are objective factors, even a generally subjective process will not satisfy the typicality and commonality requirements. *See Vuyanich v. Republic Nat'l Bank*, 723 F.2d 1195, 1199–1200 (5th Cir.1984) (finding that an employer's reliance on "two objective inputs—education and experience—in its necessarily subjective hiring process ... precludes reliance on [*Falcon* '*s*] 'general policy of discrimination' exception" (citations omitted)); *Griffin v. Dugger*, 823 F.2d 1476, 1492 (11th Cir.1987) ("[A]pplicants who were subjectively denied clerical positions cannot sufficiently identify with other applicants who failed an objective written examination."); *Williams v. Glickman*, 1997 WL 198110, at *2 (D.D.C. Apr. 15, 1997) (rejecting commonality based on allegations of a subjective employment practice when the class members did not describe a common practice, but were "describing individual instances of deviation from objective standards"); *cf. Appleton*, 168 F.R.D. at 228 ("In applying Footnote 15, the courts have required plaintiffs to show that a defendant's decisionmaking process is *entirely* subjective before permitting an across the board attack." (emphasis in original)).

Plaintiffs have not alleged or shown a discriminatory policy or procedure of general

---

13. Pamela Jones Wilson testified that she saw the *self-identification sheets with demographic information* left on applications of African–American applicants. (Docket Entry No. 51, Transcript of Class Certification Hearing, p. 113).

14. Because plaintiffs no longer attempt to certify a single "across-the-board" class comprised of job applicants and current employees seeking

transfer or promotion, plaintiffs' claims do not directly implicate the "subjective decision making processes" exception in footnote 15 of *Falcon*. However, courts have subsequently used the exception to evaluate the typicality and commonality of classes challenging only one employment practice. *See, e.g., Carpenter*, 706 F.2d at 617.

application that satisfies the commonality requirement of Rule 23(a)(2) or the typicality requirement of Rule 23(a)(3) as to the applicant class they seek to certify.

### 1. The Proposed Transfer/Promotion Class

 The record as to the claims for discrimination in transfers and promotions among clerical and administrative support African–American employees shows that such claims are individualized and dependent on consideration of each plaintiff's qualifications for the transfer or promotion he or she sought, as well as the qualifications of the white employees allegedly given preferential treatment. The evidence showed that transfer/promotions decisions were made by individual supervisors and managers dispersed throughout the Houston-area clinics. The allegations describe specific claims against particular departments or individual supervisors who denied requests for promotion or transfer by minority employees.[15]

Kelsey-Seybold's transfer/promotions decisions were made by individual hiring authorities located at different Kelsey–Seybold clinics throughout the Houston area. Courts have held that decentralized promotions decisions made in different departments of a company are insufficient to show a single, centralized promotions practice. *See, e.g., Brown,* 522 F.Supp. at 1221 n. 1; *Webb,* 78 F.R.D. at 651; *see also Wynn,* 125 F.R.D. at 700.

Plaintiffs' claims resemble those found inadequate to justify certification in *Lumpkin v. E.I. Du Pont de Nemours & Co.,* 161 F.R.D. 480 (M.D.Ga.1995):

> Although Plaintiffs share the common position of being present employees of DuPont, their allegations are discrete and individualized. They are employed in different departments, supervised by different people, work different shifts and are at different levels within the company hierarchy. Their grievances are not susceptible to generalized proof or defenses.... Plaintiffs do not point to a policy or an institution-wide practice.... Instead, they direct their grievances toward particular supervisors.... Similarly, allegations of demotions and denied promotions involve different decisionmakers.

*Id.* at 482 (citations omitted).

In addition, there is no allegation or evidence that Kelsey–Seybold used entirely subjective transfer/promotions decision making. To the contrary, the evidence was that transfer/promotions decisions included written, objective criteria and guidelines, such as time spent in the employee's current position, positive recommendations from the employee's current supervisor, and a clean personnel file.

Plaintiffs' argument that African–Americans on the on-call list were underutilized does not rest on allegations or evidence that the underutilization was a company-wide policy. To the contrary, the witness whose testimony provided the basis for this argument, Pamela Jones Wilson, testified that some individual managers preferred to use particular employees with whom they were familiar, and that some individual managers had made known their unwillingness to take African–American employees from the on-call list. (Docket Entry No. 51, Transcript of Class Certification Hearing, p. 109).

The allegations and evidence do not support an alleged discriminatory trans-

---

**15.** Plaintiffs do not appear to attempt to certify a class of on-call employees who were denied promotions to "regular" positions. Even if plaintiffs were attempting to certify such a class, Joycelyn Dysart, the only proposed class representative to testify to discrimination toward on-call employees, could not represent the class. "The opening date for membership in a class for a Title VII claim should be set by reference to the earliest charge filed by a named plaintiff." *Payne v. Travenol Labs., Inc.,* 673 F.2d 798, 813 (5th Cir. 1982). Only discriminatory actions that occurred within 300 days prior to the alleged act of discrimination described in the plaintiffs' charge of discrimination filed with the EEOC may be considered part of the class. *Cf. Merrill,* 806 F.2d at 604; *Payne,* 673 F.2d at 813–14. The date that plaintiffs' EEOC charge complains of transfer/promotion discrimination having begun is September 5, 1993; 300 days prior to September 5, 1993 is approximately November 1992. Any claim of transfer/promotion discrimination regarding the on-call list alleged by Dysart to have occurred in August 1992 is therefore barred. *See id.* at 814.

fer/promotion policy or practice of general application so as to satisfy the commonality requirement of Rule 23(a)(2) or the typicality requirement of Rule 23(a)(3).

## 2. *The Statistical Evidence*

 Plaintiffs also claim hiring and transfer/promotion discrimination based on applicant flow and promotions statistics for 1993 and 1995–96. Plaintiffs may prove intentional discrimination in hiring and promotion practices through statistical evidence that reveals "gross" statistical disparities between actual and expected hires and promotions. *Hazelwood Sch. Dist. v. United States,* 433 U.S. 299; 306–08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977); *Anderson,* 26 F.3d at 1284. However, applicant flow and promotions data must be based upon a pool of applicants or employees who are "qualified" for the positions sought. *See id.* at 1286; *Olson's Dairy Queens,* 989 F.2d at 168; *Carroll,* 708 F.2d at 192. A showing of "adverse impact" based on statistics that do not account for the qualifications of the pool is not probative of the existence of intentional discrimination. The applicant flow and promotions data presented here is not adjusted to reflect the qualifications of the applicants and employees. It therefore is not probative of the presence of classwide discrimination. *See Anderson,* 26 F.3d at 1286.

## III. Rule 23(b) Requirements

 Plaintiffs attempt to certify the proposed two classes as Rule 23(b)(2) classes. Rule 23(b)(2) classes are those in which "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief . . . with respect to the class as a whole." FED. R. CIV. P. 23(b)(2). Plaintiffs have not met their burden of showing that Kelsey–Seybold allegedly acted on "grounds generally applicable to the class," so as to qualify for certification under Rule 23(b)(2). Rather, plaintiffs' claims are alleged individual instances of discrimination, involving different jobs, different managers, different supervisors, and different clinics. Classwide injunctive relief is therefore inappropriate.

 To be certified under Rule 23(b)(2), injunctive and/or declaratory relief must be the predominant relief sought for the class. *See Griffin,* 168 F.R.D. at 190; *Celestine v. Citgo Petroleum Corp.,* 165 F.R.D. 463, 468 (W.D.La.1995). Because the predominant relief sought in this class is economic—compensatory damages, including back pay and future pay, and punitive damages—rather than injunctive and/or declaratory, certification under Rule 23(b)(2) is inappropriate. *Griffin,* 168 F.R.D. at 190–91.

## CONCLUSION

Plaintiffs' motion for certification of the proposed classes is **DENIED.**