Sherman **LOTT, et al., for themselves and on behalf of all others similarly situated, Plaintiffs,**

v.

**WESTINGHOUSE SAVANNAH RIVER COMPANY, INC., et al., Defendants.**

**Jimmy Walker, Plaintiff,**

v.

**Westinghouse Savannah River Company, Inc., Defendant.**

Civ.A. Nos. 1:98–2075–22, 1:98–2982–22.

United States District Court, D. South Carolina, Aiken Division.

May 25, 2000.

Ray Pratt McClain, Ray McClain Law Firm, Charleston, SC, Robert H. Stroup, Ivan D. Smith, James D. Esseks, Andrew H. Tarsy, Peter S. Rukin, Vladeck Waldman Elias & Englehard, Anthony Mulrain, Brown & Mulrain, New York City, for plaintiffs.

Sue Erwin Harper, Nelson Mullins Riley and Scarborough, Columbia, SC, Kenneth Edwards Young, Nelson Mullins Riley and Scarborough, Greenville, SC, Deborah A. Sudbury, Atlanta, GA, for defendants.

## ORDER

CURRIE, District Judge.

### I. INTRODUCTION

These consolidated employment discrimination cases allege causes of action under Title VII, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. The principal action, *Lott v. Westinghouse Savannah River Co., Inc., et al.*, C.A. No. 1:98–2075–22, is a putative class action brought by 98 named Plaintiffs on behalf of a potential class of over 4,000 former, current and future African American employees of the four Defendant companies operating the Savannah River Site (SRS) for the United States Department of Energy. *Walker v. Westinghouse Savannah River Co., Inc.*, C.A. No. 1:98–2982–22, asserts an individual employee's claim. The cases were originally assigned to Senior United States District Judge Charles E. Simons, Jr., and were reassigned to the undersigned on No-

vember 18, 1999, upon the death of Judge Simons.

The cases are before the court on Plaintiffs' Motion for Class Certification [262–1] [1], Plaintiffs' Motion to Bifurcate Class Liability Issues from Individual Relief Issues [261–1], and Defendants' Motion to Strike Plaintiffs' Request for Class–Wide Punitive Damages [320–1]. Also pending are three motions by Defendants to strike or exclude certain evidence from being considered by the court in conjunction with Plaintiffs' Motion for Class Certification. Those motions include Defendants' Motion to Strike Portions of the Ivan D. Smith Declaration [293–1], Motion to Strike the Affidavit of Jinna J. Shin [295–1], and Motion to Strike the "Calhoun Study," [297–1], all of which were filed January 18, 2000. All six motions have been briefed and the court has received and reviewed over five boxes of filings relating to the motions.

Oral argument on Plaintiff's motion for class certification was held on April 26, 2000. At the conclusion of the hearing, the court took all motions under advisement, indicating it would issue an opinion after reviewing all documents designated by counsel as supporting the instant motions, as reflected in Court's Exhibit 1.[2]

The court now finds that Plaintiffs' Motion for Class Certification must be denied as to the proposed class or any subclass suggested by Plaintiffs. Accordingly, Plaintiffs' Motion for Class Certification is DENIED. Plaintiffs' related Motion to Bifurcate Class Liability Issues is MOOT in light of the court's ruling on the class certification motion. Defendants' Motion to Strike Plaintiffs' Request for Class–Wide Punitive Damages is also MOOT for the same reason. Defendants' Motion to Strike the Ivan D. Smith Declaration and Ray McClain Declaration is PARTIALLY GRANTED, PARTIALLY DENIED. Defendants' Motions to Strike the

Jinna J. Shin Affidavit, and "Calhoun Study" are DENIED, as more fully explained below.

## II. PROCEDURAL HISTORY

The *Lott* action was originally commenced on October 31, 1997, in the Southern District of Georgia, Augusta Division, on behalf of ten named present and former African American employees of Defendants.[3] It was transferred to this court on July 17, 1998, and an Amended Complaint was filed on September 16, 1998. The case of *Walker v. Westinghouse*, C.A. No. 1:98–2982, was transferred to this District on October 13, 1998. Both *Lott* and *Walker* were referred to United States Magistrate Judge Joseph R. McCrorey for pretrial disposition. By order of March 5, 1999, Magistrate Judge McCrorey ordered that *Lott* and *Walker* be consolidated. Numerous discovery and pleading-related motions were filed. By order of May 14, 1999, Magistrate Judge McCrorey issued an order granting Plaintiffs' Motion for Leave to File Third Amended Complaint. The Third Amended Complaint in *Lott* differed significantly from earlier pleadings, and permitted joinder of an additional 88 named Plaintiffs to the ten originally-named Plaintiffs, for a total of 98 named *Lott* Plaintiffs. Each of the four named Defendants in the consolidated actions answered on June 14, 1999. Discovery proceeded under scheduling deadlines monitored by Magistrate Judge McCrorey.

## III. THE PLEADINGS

The material allegations of the pleadings are as follows. The Third Amended Complaint states that the action is brought on behalf of current, future and former African American employees who worked for Defendants within three years prior to the filing of this action, which was October 31, 1997 for *Lott*.[4] The action is a putative class action by 98 named Plaintiffs to remedy race discrimination under Title VII and 42 U.S.C. § 1981.

---

1. All bracketed numbers reflect docket number entries in the *Lott* case.

2. Court's Exh. 1 is a copy of the docket sheet marked by counsel to specify the documents submitted in connection with these motions.

3. The 10 originally named Plaintiffs included Sherman Lott, Vernelle Payton, Larry Coleman, Ava Hawkins, Curtis Young, Clinton Edwards, Jr., Francis H. Newman, Jr., Samuel Quiller, Pamela Wade, and Bennie Breeland.

4. Mr. Walker's pro se complaint was filed in the Southern District of Georgia on June 19, 1998.

Plaintiffs allege they "primarily seek injunctive relief to make equal employment opportunities available to all Black employees of defendants," but also seek back pay, compensatory damages, including damages for pain and suffering and emotional distress, and punitive damages, as well as attorneys' fees and costs. Paragraph 3 of the complaint alleges that Defendants have engaged in a pattern and practice of denying African American employees equal employment opportunities in the areas of promotions, pay levels, training, retention of pay levels and positions or demotions, and by exposing African American employees to less desirable, higher radiation exposure-rate positions.

Only twelve of the named Plaintiffs have exhausted administrative EEOC/SHAC remedies. The complaint asserts that, "[t]he other named plaintiffs have claims that are so similar to the claims set forth, on a class basis, in the EEOC charges filed by the original twelve named plaintiffs that no further conciliatory purpose would be served by filing separate EEOC charges." .

Paragraph 109 of the complaint alleges that the four Defendants operate the Savannah River Site (SRS) under contract with the United States Department of Energy (DOE). Defendants recycle and reload tritium for use in nuclear weapons, produce plutonium for space exploration, and process radioactive waste and other hazardous materials. The complaint asserts that as a result of an agreement entered into by all four Defendants on October 1, 1996, all four entities operate under an integrated management and personnel structure. The complaint alleges that approximately 20% of the employees working at the SRS are African Americans, who have been subjected to diverse forms of race discrimination.

The complaint recites allegations of discriminatory practices affecting five aspects of employment: promotions and job evaluations, salaries, training, demotions and hazardous job exposure. Plaintiffs first allege Defendants have discriminated against them in the area of promotions, by failing to maintain a job-posting program at all prior to June 1997, and by operating the job-posting program in a discriminatory manner thereaf-

ter. Plaintiffs further contend that Defendants' job evaluation programs have been used to deny African Americans promotions because African Americans are rated significantly lower than white employees by the predominately white decisionmakers who rely on subjective, race-based factors. Specifically, Plaintiffs challenge the Individual Assessment and Development Plan (IADP) in operation through 1997, and its successor, the Performance Assessment and Development Plan (PADP). Finally, Plaintiffs contend that employees who are not exempt employees under the Fair Labor Standards Act (FLSA), called "nonexempt employees," have been adversely affected by a discontinuation of a promotional program for nonexempt employees with four-year degrees. In sum, Plaintiffs contend these promotion policies have had a disparate impact on promotions for African Americans at SRS.

Plaintiffs also contend Defendants have tended to keep African American employees in higher-radiation exposure jobs longer than white employees as a result of denying them transfer or promotion opportunities. Thus, Plaintiffs assert that Defendants have a disproportionate number of African American employees filling Operator, Radiation Control Inspector and other similar positions, resulting in higher radiation exposure rates and illness rates for African American employees compared to white employees. As a result of these alleged discriminatory practices, the workforce at SRS, is skewed, according to Plaintiffs, and fails to include a proportionate number of African Americans at professional and managerial levels. Plaintiffs further allege salary disparities exist between African American and white workers doing the same jobs and that these disparities result to some degree from the discriminatory job evaluation programs and other systems having a disparate impact on African Americans.

In addition, Plaintiffs contend Defendants have denied African Americans access to training equivalent to that extended to White employees. Specifically, Plaintiffs charge Defendants have a system of selecting employees for training using race-based subjective grounds, and that this practice disparately affects African Americans and denies

them access to promotions and higher performance ratings.

Plaintiffs also allege that Defendants have discriminated against African American employees by demoting them in disproportionate numbers by a process known as "bust back," in which FLSA-exempt employees are returned to a nonexempt position. Plaintiffs contend Defendants have employed subjective practices to determine which employees are demoted and that this practice has affected African American employees in a disparate manner.

Following the generalized allegations of discriminatory practices, the complaint recites individual factual backgrounds and claims of each of the 98 named Plaintiffs. Plaintiffs' "Claims for Relief" include ten claims, denominated Claims I—X, representing Title VII and 42 U.S.C. § 1981 claims based on each of the five categories of discriminatory practices. Plaintiffs ask the court to certify these cases as one class action, to enjoin Defendants' discriminatory employment practices, and place Plaintiffs in the positions in which they would have been but for the alleged discrimination. They also seek "make whole" relief in the form of back pay, compensatory and punitive damages, as well as attorneys' fees and costs.

Each Defendant filed a separate answer to Plaintiffs' Third Amended Complaint on July 6, 1999. Nevertheless, the answers are substantially similar. Defendants admit that the first named Plaintiffs to this action have exhausted their administrative claims, but deny that it is unnecessary for other Plaintiffs to do so. Westinghouse Savannah River Company, Inc., ("WSRC") admits that it performs services at SRS pursuant to a DOE contract and that the three other Defendants render services pursuant to a contract with Westinghouse Electric Corporation ("WEC"). Defendants admit that they have entered into an agreement, "Agreement Among Westinghouse Savannah River Company, Bechtel Savannah River, Inc. ("Bechtel"), B & W Savannah River Company ("BWSRC"), and BNFL Savannah River Corporation ("BNFL–SRC") Regarding Status of Employees," effective October 1, 1996. WSRC admits that at the end of 1997, approximately 12,411 employees were employed at the Site by all four Defendants. WSRC was the most significant employer, employing 10,178 of those 12,411 employees, 2,048 of whom were African American. WSRC admits it previously utilized a performance evaluation system known as IADP and that bustbacks or demotions have occurred in the past.

Defendants' answers also set forth individualized responses and defenses to each of the 98 named Plaintiffs' claims. These responses vary greatly from Plaintiff to Plaintiff, depending on the nature of claims asserted. Defendants deny all other material allegations of the complaint. Among other defenses, including statute of limitations or release, Defendants contend this action is unsuitable for class determination because of the necessity of individualized proofs, precluding a finding of commonality and typicality, Rule 23(a), FRCP.

## IV. FACTS

The property described as the "Savannah River Site" is a nuclear installation. Between 1989 and 1996, WSRC managed SRS for the Department of Energy (DOE), with Defendant Bechtel responsible for construction. In 1996, all four Defendants agreed to operate and manage the site as a "seamless organization." (Status of Employee Agreement at 1).

The four Defendants employ a combined, multi-tiered management structure. At the top is WSRC President, Joseph Buggy. Acting as his vice-presidents are the Presidents of BNFL–SRC, BWSRC and Bechtel. There were approximately 1009 managers at SRS in fiscal year 1999, approximately 75 of whom were African American. (Haworth Aff., 1/10/00). There were 483 supervisors at SRS in fiscal year 1999, 120 of whom were African American. *Id.*

The four Defendants are the "Performing Entity" for operation of SRS. They operate under a single set of policies governing human resources matters. One Human Resources Division oversees all employee relations policies and matters affecting site employees. The four Defendants have all employed the same site-wide programs for

performance evaluation, compensation, demotion or bustback, promotion/posting and job assignment. One Director of Human Resources oversees all functions for all Defendants. Written manuals documenting these practices have been used at site-wide training seminars for managers employed by all four Defendants.

Employees are "shared" in the sense that some employees have one Defendant as their "employer" with another Defendant as their "Supervising Entity" of daily work. Only the "employer" may hire and fire the employee. Employees are frequently transferred between and among Defendants, at all levels.

The total workforce size was 13,127 for fiscal year 1999. The employees fall into four basic groups. The first includes "exempt" workers, who are exempt from FLSA overtime requirements. Some exempt employees are incentive eligible executives. There were 6,052 exempt employees in 1999. The second category includes "non-exempt" workers, of which there were 5,176 employees in 1999. The third group includes the "Selective Overtime Position" (SOP) employees, of which there were 1,160 in 1999. The last category includes those construction craft employees who are employed and supervised by BSRI and who operate pursuant to a collective bargaining agreement and several project agreements. There were 739 craft employees in 1999.

During the relevant five-year period, Defendants administered a significant number of different employment policies. Defendants' Addendum A, Section III, illustrates the wide variety of plans in effect during this time period. Several job evaluation and promotion/posting procedures were used, some of which applied only to one of the four categories of employees. For example, under the current procedure, depicted in Addendum A, job promotion/posting for craft employees is based on the Foreman Selection Process, Detail Foreman Promotions Process and the Joint Apprenticeship Program. However, procedures for nonexempt employees include the Salary Grade Promotions program, Time in Grade Promotions program, First Line Program, and Competency–Based Posting System. SOP employee pro-

motions/postings are governed by the Planned Promotions Program and Competency–Based Posting System. Finally, exempt employee promotions/postings are based on the Planned Promotions Program, Critical Positions Program, and the Competency–Based Posting System. Over the relevant period, a total of 10 different promotion/job posting programs have applied for varying lengths of time to groups of employees in the four categories. A similar wide array of employment policies have applied in the areas of job evaluation and salary administration.

Plaintiffs' demotion claims based on "bustback" apply only to nonexempt positions. Such rights allow certain nonexempt employees who were promoted to an exempt position the right to "bustback" to a nonexempt position if they prefer the position or their exempt position is eliminated. Eligibility for bustback has been altered significantly over the years. In fiscal year 1994, the policy was that nonexempts who were promoted to exempt positions prior to July 1993 retained unlimited bustback rights. Two years later, however, in October 1996 the policy changed such that nonexempts who were promoted to exempt positions after October 1996 could bustback only for the first six months following the promotion. The following year the policy was significantly changed for all former nonexempts promoted to exempt positions. The policy now is that irrespective of date of promotion, an exempt employee can bustback only if he requalifies for the nonexempt position within six months of returning.

Many of the job evaluation programs require managers and supervisors to provide individualized assessments of those employees reporting to them. For example, the IADP required the employee and her manager to jointly discuss expectations for the upcoming year, and evaluate the employee's performance against that measure. An example of the IADP is set forth as Exhibit 57 (sealed) to the Declaration of James D. Esseks, filed November 1, 1999. The IADP required the signature of the employee and direct manager on each page, as well as the signature of the second level manager on the last page.

SRS issues monthly radiation reports reviewed by medical personnel to ensure radiation doses received by employees are below governmental regulatory limits. Obviously, some positions pose a greater threat of radiologic exposure than others. SRS attempts to rotate employees in certain positions to minimize their radiologic exposure. Nonexempt employees working in radiologic exposure positions may in some cases exercise seniority to control their job assignment. Defendants maintain that some African American employees working in radiologic exposure jobs who could have exercised seniority to transfer to less hazardous positions have instead elected to remain in their present, higher risk placements.

## V. DEFENDANTS' MOTIONS TO STRIKE

### A. Motion to Strike "Calhoun Study"

■ The document described as the "Calhoun Study" is a two-page exhibit submitted by Plaintiffs in support of the motion for class certification.[5] The first page of the study contains listings of IADP ratings by racial groups. This page of the study was prepared by WSRC's EEO manager, Habersham, and was prepared on behalf of the Diversity Task Force Team. The second page of the study contains a bar chart reflecting IADP distributions among "white," "minority" and "black employees." This second page, which contains another portrayal of the same information on the first page, was prepared by Phyllis Calhoun Hurley, a former WSRC employee and current Plaintiff, who was once employed as EEO Compliance Programs Manager in the EEO Department of WSRC. Ms. Hurley used the information in the Habersham report, which she received in the course of her employment, in order to prepare her bar chart. The information contained in the Habersham report and Ms. Hurley's bar chart depiction is drawn from WSRC's internal human resources information system, "Tesseract."

5. Plaintiffs submit the Calhoun Study to support their arguments that African American employees received statistically significant, disproportionately low numbers of high ratings under the

Defendants raise numerous arguments that the Calhoun study is inadmissible to support the class certification motion. First, they charge that the Calhoun study is "statistical evidence," which needs to be accompanied by expert testimony. It is undisputed Ms. Hurley is not a qualified expert witness. Defendants do not contend, however, that the Calhoun Study is inaccurate. Second, Defendants charge that the Calhoun study has not been properly authenticated pursuant to FRE 901. Neither argument has merit under present circumstances.

■ It is undoubtedly true that statistical evidence is inherently malleable and subject to careful scrutiny. *EEOC v. Western Elec. Co.*, 713 F.2d 1011, 1018 (4th Cir.1983). The general rule is that statistical evidence must be supported by expert testimony. *Carter v. Ball*, 33 F.3d 450, 456 (4th Cir.1994).

Plaintiffs respond that no expert testimony is needed to support the Study because it was created initially by Habersham by applying simple grade-school level arithmetic to raw data drawn from Tesseract and that Hurley simply reformatted the same information in a different display. Plaintiffs rely on *Stratton v. Department of Aging*, 132 F.3d 869, 877 (2d Cir.1997) (ADEA plaintiff's charts depicting ages of senior staff before and after appointment of new manager admitted at jury trial without expert testimony because only simple arithmetic was used and no sophisticated statistical theories required explanation), and *Green v. Kinney Shoe Corp.*, 715 F.Supp. 1122, 1124 (D.D.C.1989) (simple arithmetic depictions admissible at trial).

Because the basis for the Calhoun Study was the Habersham Report, WSRC's own internal report, and no challenge is offered to the accuracy of either page of the Calhoun Study, the court finds that Plaintiffs' Calhoun Study is admissible to support Plaintiffs' class certification motion.

IADP performance evaluation system and that SRS management was alerted to these discrepancies.

### B. Motion to Strike Shin Affidavit

■ Defendants move to strike the affidavit of Jinna J. Shin, a paralegal employed by Plaintiffs' law firm, on the grounds that it is not based on personal knowledge and that Ms. Shin is not an expert qualified to submit such evidence. The Shin affidavit is a three-page affidavit that sets forth the number of SRS employees by EEO job category and job group. Based on those figures, Ms. Shin calculated the number and percentage of African American employees at each EEO job level. Shin prepared her affidavit based on the report of Dr. Bradley, Plaintiffs' expert, and a WSRC document entitled "Equal Employment Operations AAP Job Groups." Plaintiffs' expert Bradley had produced his report based on information drawn from WSRC's personnel database. His report identified the SRS racial composition by EEO Job Category and EEO Job Group.

To prepare her affidavit, Shin combined information from the Bradley report with information from the AAP Job Groups Document. She matched up racial demographic data from the Bradley report with the information about the EEO Job Categories and EEO Job Groups in the AAP Job Groups Document. Using demographic information from the Bradley report and simple addition, she calculated the number of white and African American employees at SRS holding managerial positions. Using division and multiplication, she then calculated the corresponding percentages for those figures. The Shin affidavit is submitted to support Plaintiffs' contention that African Americans represent only a small percentage of SRS managers and an even fewer number of top-level executives.

Defendants contend that the affidavit should be stricken because Shin admits it is not based on her personal knowledge of the composition of SRS workforce and she prepared it at her employer's directions using basic level mathematics. Moreover, Defendants contend the affidavit should be stricken because it contains quantitative statistical evidence requiring expert testimony as to the methodology used and the relevancy of such evidence to the issues in the case. Defendants do not, however, challenge the accuracy of any of the mathematical calculations contained in Shin's affidavit.

Although the court generally does not condone the utilization of law firm personnel and lawyers as witnesses in a case, the court finds that exclusion of the Shin affidavit is unwarranted in the present circumstances. Certainly it would have been better practice if Plaintiffs had retained Dr. Bradley to provide the same information as that contained in the Shin affidavit, but the court is unpersuaded that only a qualified statistician may perform the simple arithmetic calculations utilized.

Shin, as a fact witness, may testify to matters of which she has personal knowledge. FRE 602. She indisputably has personal knowledge as to the arithmetic calculations she performed. This basic familiarity satisfies the personal knowledge requirement for affidavits, *see Spannaus v. United States Dep't of Justice,* 813 F.2d 1285, 1289 (4th Cir.1987).

Defendants' challenge that the Shin affidavit contains evidence requiring expert testimony is similar to the argument dismissed above with respect to the Calhoun Study. Although observing that statistical evidence is always subject to careful scrutiny, *Western Elec.,* 713 F.2d at 1018, this court concluded above as to the Calhoun Study that it required no expert statistical testimony because it employed only simple mathematics and was based on Defendants' own database. Although the Shin affidavit contains some information of a more attenuated nature, it basically applied simple arithmetic to information contained in the Bradley report (which was drawn from Defendants' own personnel database) and a WSRC document, the AAP Job Groups Document. Accordingly, for the same reasons cited above regarding the Calhoun Study, the court finds the Shin affidavit admissible for the purpose of supporting Plaintiffs' class certification motion.

### C. Motion to Strike Portions of Smith Declarations & McClain Declaration

■ Defendants move to strike paragraphs 3 and 4 of the Declaration of Ivan D. Smith, Plaintiffs' lead counsel, dated October

15, 1999, the entire Supplemental Declaration of Ivan D. Smith, dated December 1, 1999, and the entire Declaration of Ray McClain, Plaintiffs' local counsel, dated October 18, 1999. Defendants argue that Smith's declarations constitute improper testimony by counsel about which he lacks personal knowledge, mischaracterize the record, and are an attempt by counsel to act as an expert in his own case. Defendants ask the court to strike the McClain declaration on the grounds that it is hearsay.

Paragraphs 3 and 4 of the first Smith Declaration contain Mr. Smith's summary of much of the evidence. For example, paragraph 3 recounts numerous instances in which Plaintiffs testified in deposition concerning threats of violence, insults, racial epithets, jokes, and racially-offensive nicknames for work areas and equipment. It also asserts that Defendants' managers reacted "with nonchalance" to reports of the racial harassment. Paragraph 4 discusses the results of the 1992–1999 Affirmative Action Plans for the Site and includes extracts of those plans which purport to recognize the underrepresentation of African Americans at certain levels of management. Mr. Smith's Supplemental Declaration contains as an attachment the Report by Dr. A. James Ruttenber, Plaintiffs' medical expert, entitled "Report on the Relation Between Race and Radiation Doses for the Savannah River Site, 1991–99." Mr. Smith's declaration accompanying the report attempts to explain the report and asserts that the Ruttenber study has shown "a pervasive pattern of assigning black employees to jobs with higher radiation exposure." Also attached to the Supplemental Smith Declaration is the report of Dr. Outz, Plaintiff's employment practices expert, whose report Smith describes as showing "that a number of the defendants' employment practices do not meet applicable legal standards." Finally, the Supplemental Declaration also attaches the report of Dr. Bradley, Plaintiffs' expert statistician, whose report Smith describes as showing "that there are common employment practices at the Site that are racially discriminatory and/or have had an adverse impact upon employment opportunities for black employees." The Declaration of McClain is a brief, non-

argumentative declaration that simply attaches as an exhibit in support of the class certification motion extracts from the deposition of Phyllis Calhoun–Hurley, one of the named Plaintiffs, in which Ms. Hurley recounts second-hand reports of racial comments allegedly reported to her by George Harley, Vice–President of Human Resources, another African American employee.

Plaintiffs respond that the declarations are merely an attempt to highlight relevant portions of the voluminous record for the court's convenience and should not be stricken. They deny that the declarations constitute an attempt by counsel to "testify," and insist that citations to the documentary evidence or deposition are provided in every instance. Finally, they insist that Ms. Calhoun–Hurley's account of her conversation with Vice–President Harley is fully admissible under the hearsay exception for statements offered against a party and made by the party's agent or servant concerning a matter within the scope of agency or employment, made during the existence of the relationship, FRE 801(d)(2)(D).

To support their position that Smith's declarations stretch the evidence, Defendants have submitted a two-volume exhibit containing relevant deposition excerpts from the 99 named Plaintiffs. Presumably Defendants have submitted these extracts in an attempt to show mischaracterization of the evidence in the Smith declarations. The court has reviewed the deposition excerpts and compared them with the summarized references in the Smith declarations. Although the court agrees that the evidence set forth in the Smith declarations is certainly postured in the light most favorable to Plaintiffs, the court has uncovered no "gross" mischaracterizations. What the court has discovered is that the Smith Declarations are not "evidence" at all, but are really legal argument in this case in support of Plaintiff's motion for class certification.

■ Insofar as an affidavit of counsel may attempt to introduce substantive evidence, "it is elementary that counsel may not participate both as an advocate and as a witness, absent special circumstances." *Spivey v.*

*United States,* 912 F.2d 80, 84 (4th Cir.1990). The court finds the appropriate remedy in this case is to partially grant, and partially deny Defendants' motion as to the Smith Declarations. In other words, the court strikes the Smith Declarations as "evidence" in support of the motion for class certification.[6] The court will deny the motions to strike as to all exhibits attached to the Smith declarations, because no independent challenge is offered by Defendants to those exhibits and the exhibits, if offered without the declaration, would have been admissible. As to the McClain Declaration, it simply identifies for the court an exhibit in the case without any attempt at characterization. The testimony of Ms. Hurley, although hearsay, is an account of a statement by a senior WSRC Human Resources Manager made during the course of employment and would appear to be encompassed within the hearsay exception, FRE 801(d)(2)(D). Accordingly, insofar as Defendants' motion to strike seeks to include the McClain Declaration, it is denied.

## VI. PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

### A. Generally

Plaintiffs seek to have this action certified as a class under Rule 23(b)(2) (where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole;"), or, in the alternative, as a hybrid action in which a liability class is certified under Rule 23(b)(2) and a damages class is certified under Rule 23(b)(3) (where court finds that questions of law or fact common to members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy).

Class certification is strictly a procedural matter and the merits of the claims are not to be considered when deciding whether to certify a class. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Following the Supreme Court's admonition in *East Texas Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 405, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977), that careful attention to the requirement of [Rule 23] remains nonetheless indispensable [in Title VII actions], the Fourth Circuit in *Stastny v. Southern Bell Tel. & Tel. Co.,* 628 F.2d 267, 273 (4th Cir.1980), cautioned that "the broad remedial purposes of Title VII and the undoubted utility and fitness of the class action device for many Title VII actions do not relieve the obligation imposed by subsections (a) and (b) of Rule 23 to inquire into the specific fitness, on its own facts, of each Title VII case for which class action status is sought." Two years after *Stastny* the Supreme Court reiterated that a district court is under a duty to undertake a "rigorous analysis" to satisfy itself that the Rule 23(a) requirements are met, *see General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). More recently, in *Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331, 343–45 (4th Cir.1998) (putative class action contract claims brought by franchisees against franchiser), the court returned to this theme, warning that plaintiffs may not have "the practical advantage of being able to litigate not on behalf of themselves but on behalf of a 'perfect plaintiff' pieced together for litigation." Because the Fourth Circuit found the certified class in *Broussard* nothing more than "a hodgepodge of factually as well as legally different plaintiffs, ... that should not have been cobbled together for trial," it reversed the district court's certification order. *Id.* at 343. Finding that each franchisee's claims and right to toll the statute of limitations had to be individually examined, the court concluded that "the disparate nature of the claims precludes class treatment." *Id.*

As the burden of establishing class status is on the Plaintiffs, *International Woodwork-*

---

6. The court will, however, consider Smith's comments as legal argument in the case, particularly where, as here, Defendants have vigorously pointed out each and every alleged mischaracterization to the court.

ers of America v. Chesapeake Bay Plywood Corp., 659 F.2d 1259, 1267 (4th Cir.1981), the question before the court is whether Plaintiffs have demonstrated that the proposed class encompassing over 4,000 employees is suited by utility and fitness to the framework of Rule 23, FRCP.

Certification under Rule 23 is a two-tier inquiry. First, the proposed class action must satisfy all four prerequisites set forth under Rule 23(a):

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

The preceding requirements are known as numerosity, commonality, typicality, and adequacy of representation. If the proposed class satisfies the preceding list, then the second-tier of inquiry is reached in which the court must find that the action qualifies for one of the three categories of classes recognized in Rule 23(b) (briefly summarized, where prosecution of separate actions would entail risk of inconsistent or dispositive adjudications, where final injunctive relief or corresponding declaratory relief with respect to the class as a whole is appropriate, or where questions of law or fact common to the class predominate over questions affecting individuals and a class action is superior to other available methods).

## B. Numerosity

To establish numerosity, the class must be of such a size that joinder of all members is impracticable. Holsey v. Armour Co., 743 F.2d 199, 217 (4th Cir.1984). Practicability of joinder depends on the size of the class, ease of identifying its numbers and determining their addresses, facility of making service on them if joined in the action and their geographic dispersion. Kilgo v. Bowman Transp., Inc., 789 F.2d 859, 878 (11th Cir.1986). No bright line test exists

for determining numerosity, however, and the determination rests on the court's practical judgment in light of the particular facts of the case. Buford v. H & R Block, Inc., 168 F.R.D. 340, 348 (S.D.Ga.1996), aff'd sub nom. Jones v. H & R Block Tax Servs., 117 F.3d 1433 (11th Cir.1997). Here, Defendants do not challenge Plaintiffs' proposed certification on numerosity grounds. The court finds, based on the specific facts of this case, that proposed joinder of over 4,000 current, future, and former employees is impracticable to vindicate Plaintiffs' claims. Accordingly, the court finds the numerosity criterion satisfied.

## C. The Commonality Criteria: Commonality & Typicality

### 1. Generally

Rule 23(a)(2) commonality requires the individual's claims and the class claims to have common questions of law or fact. The inquiry is not whether common questions of law or fact predominate (as in a(b)(3) analysis), but only whether they exist. Zapata v. IBP, Inc., 167 F.R.D. 147, 158 (D.Kan.1996). Nevertheless, "[i]t is not every common question that will suffice, however; .. [w]hat we are looking for is a common issue the resolution of which will advance the litigation." Sprague v. General Motors Corp., 133 F.3d 388, 397 (6th Cir.1998) (en banc), cert. denied, 524 U.S. 923, 118 S.Ct. 2312, 141 L.Ed.2d 170 (1998).

Typicality determines whether a sufficient relationship exists between the injury to the named plaintiffs and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct. Zapata, 167 F.R.D. at 160. Typicality and commonality are often categorized as redundant criteria, with the Fourth Circuit treating typicality as overlapping with commonality. Stott v. Haworth, 916 F.2d 134, 143 (4th Cir.1990). The commonality and typicality requirements of Rule 23(a) tend to merge. General Tel. Co. v. Falcon, 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

Because inquiries into the commonality of issues and the typicality of claims in a Title

VII case are closely related, they may for convenience be referred to collectively as "the commonality criteria," *Stastny*, 628 F.2d at 273 n. 8. The combined criteria are "guideposts for determining whether ... maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 157 n. 13, 102 S.Ct. 2364.

### 2. *Falcon* Sounds the Death Knell for "Across the Board" Attacks

In *Falcon* the Supreme Court considered the commonality criteria of Rule 23(a) and "pulled in the reins on across-the-board attacks." *Zapata*, 167 F.R.D. at 158. Since *Falcon* "[t]he key to the commonality requirement in discrimination cases seems to be whether there is evidence of centralized decisionmaking." *Id; see also Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211 (D.Md.1997). In *Falcon*, the plaintiff claimed a failure to be promoted on account of his Mexican American status. He sought to have certified a class of similar Mexican Americans who were then employed by the defendant or who might be employed at its place of business In Irving, Texas. The Fifth Circuit approved certification, relying on the across-the-board rule. Nevertheless, the Supreme Court reversed, finding that the plaintiff had failed to satisfy his burden of showing the commonality criteria was satisfied:

> We cannot disagree with the proposition underlying the across-the-board rule—that racial discrimination is by definition class discrimination. But the allegation that such discrimination has occurred neither determines whether a class action may be maintained in accordance with Rule 23 nor defines the class that may be certified. Conceptually, there is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims

> will share common questions of law or fact and that the individual's claim will be typical of the class claims. For [plaintiff] to bridge that gap, he must prove much more than the validity of his own claim. Even though evidence that he was passed over for promotion when several less deserving whites were advanced may support the conclusion that [plaintiff] was denied the promotion because of his national origin, such evidence would not necessarily justify the additional inferences (1) that this discriminatory treatment is typical of [defendant's] promotion practices, (2) that [defendant's] promotion practices are motivated by a policy of ethnic discrimination that pervades petitioner's Irving division, or (3) that this policy of ethnic discrimination is reflected in [defendant's] other employment practices, such as hiring, in the same way it is manifested in the promotion practices. These additional inferences demonstrate the tenuous character of any presumption that the class claims are 'fairly encompassed' within [plaintiff's] claim.

*Id.* at 157–58, 102 S.Ct. 2364. Thus, in *Falcon* the Court found that plaintiff was not entitled to certification of a single class consisting of employees who were not promoted or who were not hired, allegedly on account of their Mexican American status.

The *Falcon* Court, in a footnote relevant to many of the theories advanced by Plaintiffs in the instant case, did however recognize that, "[s]ignificant proof that an employer operated under a general policy of discrimination conceivably could justify a class of both applicants and employees if the discrimination manifested itself in hiring and promotion practices in the same general fashion, such as through *entirely subjective decisionmaking processes*." *Id.* at 159 n. 15, 102 S.Ct. 2364 (emphasis added). Here, Plaintiffs challenge a wide range of Defendants' employment practices on the grounds that they employ subjective decisionmaking and standardless processes and claim entitlement to certification based on such processes, as noted in *Falcon*.

### 3. *Stastny:* the framework for a Rule 23(a) certification inquiry

█ In a leading Fourth Circuit case, *Stastny v. Southern Bell Tel. & Tel. Co.,* 628 F.2d 267, 277 (4th Cir.1980), the court rejected a district court's certification order founded on "commonality determinations ... [that] could only have been made on the basis of speculation or larger leaps of inference than we think are permitted for Title VII cases..." Plaintiffs in *Stastny* sought certification of a state-wide class of female employees who had been denied promotions. The female employees were scattered at various Southern Bell facilities in North Carolina. To support certification the plaintiffs relied in part on statistical evidence based on data drawn from all of Southern Bell's North Carolina facilities. In reversing, the Fourth Circuit found the district court record fatally deficient as to several critical factors. Significantly, the appeals court concluded that the district court had failed to appreciate that it was unlikely an employment pattern or practice existed in light of the dispersion of the workforce in geographically separated facilities. The Fourth Circuit directed district courts conducting a certification review to inquire into the following five factors:

(1) What is the nature of the alleged unlawful employment practice and is it one that peculiarly affects only one or a few employees or is it genuinely one having a class-wide impact;

(2) How uniform or diverse are the relevant employment practices of the employer, considering matters such as the size of the workforce, number of plants involved, diversity of employment conditions, occupations, degree of geographic dispersion and intra-company transfers and interchanges of employees and degree of decentralization of administration and supervision.

(3) How uniform or diverse is the membership of the class, in terms of the likelihood that the members' treatment will involve common questions;

(4) What is the nature of the employer's management organization and the degree of centralization and uniformity of relevant employment and personnel policies and practices;

(5) What is the length of time span covered by the allegations and what is the probability that similar conditions prevailed throughout the period.

628 F.2d at 277. In reversing the grant of certification in *Stastny,* the Fourth Circuit concluded the plaintiffs had failed to carry their burden of satisfying the commonality criteria and that the record was deficient as to several of these critical factors. *Id.* at 278.

### 4. Application of *Stastny* factors

#### (i) Nature of alleged unlawful employment practice

█ Applying the *Stastny* factors to the case at hand, the court may assess Plaintiffs' satisfaction of the commonality criteria. As to the first element concerning nature of the alleged unlawful employment practices, Plaintiffs attack five discrete aspects of employment practices: promotion and evaluation, salaries, training, hazardous job assignments, and demotion/bustback. Although these are broad policies that apply to many employees at SRS, as has been seen above, different policies apply to different types of employees. Moreover, of the five employment practices attacked by the putative class, no single employment practice is challenged by all 99 named Plaintiffs. Thus, the court concludes that there is no challenged employment practice that has class-wide impact on all past, present and future African Americans employed at SRS. Defendants' Addendum C in support of the class certification motion, a tabular summary chart depicting Individual Plaintiffs' Claims, and Addendum E, extracts of Plaintiffs' deposition statements concerning their claims, cogently and accurately illustrate this diversity and lack of commonality.

█ Although Plaintiffs have valiantly attempted to couch this putative class action in terms of a "pattern and practice" disparate impact case attacking general employment policies that adversely affect African Americans, the court finds that the true nature of the suit is a consolidation of 99 separate

accounts of individualized disparate treatment. As the court in *Stastny* acknowledged, in a "pattern or practice" case, it is the employer's "regular or standard operating procedure" to demonstrably treat the protected class in relatively unfavorable ways so that it justifies a rebuttable inference that it proceeds from an intention to treat them differently. 628 F.2d at 273, citing *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). There is no private, non-class cause of action for "pattern and practice" discrimination under Title VII in the Fourth Circuit. *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 760 (4th Cir.1998). Although Plaintiffs have submitted a wealth of statistics of disparate impact to buttress their "pattern and practice" claims, the Supreme Court in *Falcon* made clear that statistics alone were insufficient to carry the plaintiff's burden under a Rule 23(a) certification for "pattern and practice" claims. 457 U.S. at 159, 102 S.Ct. 2364.

It is indisputably true that:

the class action commonality criteria are, in general, more easily met when a disparate impact rather than a disparate treatment theory underlies a class action. The disparate impact "pattern or practice" is typically based upon an objective standard, applied evenly and automatically to affected employees: an intelligence or aptitude test, e.g., *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); an educational requirement, *id;* a physical requirement, e.g., *Weeks v. Southern Bell Tel. & Tel. Co.*, 408 F.2d 228 (5th Cir.1969).

*Stastny*, 628 F.2d at 274 n. 10. Were Plaintiffs' much-touted "disparate impact" claims genuine this court would have little hesitation in certifying some form of class proceeding under Rule 23. The problem is that they are not.

Plaintiffs have attempted to show that various evaluation policies, salary policies, training policies and the like have had a disparate impact on African Americans because African Americans do not fare statistically as well as others under those policies. The situation prevailing in a bona fide disparate impact case in which an employment test or policy, neutral on its face and applicable to all employees, impacts adversely on the protected class is not present here. Another element figures prominently: the intervening conscious decisions of a multitude of diverse managers and supervisors. It is the participation and conscious expression of choice by those managers and supervisors which renders this case distinguishable from the classic disparate impact case. Here, some manager or supervisor has consciously determined that African American Plaintiff X should have received a "3" IADP rating whereas white co-employee Y, performing the same task, should have received a "5" rating in the same year and had a greater salary increase. This is the hallmark of an individual disparate treatment case. Even a casual examination of Plaintiffs' Third Amended Complaint and the litany of individualized complaints reveals that Plaintiffs' claims are, in fact, disparate treatment claims. Similarly, the defenses asserted by Defendants are tailored to each Plaintiff. For example, some Plaintiffs have statute of limitations, waiver or release defenses asserted against them, further compelling proof of the unique nature of each case.

It is understandable that Plaintiffs would attempt to take advantage of the benefits of a disparate impact theory, in which they do not have to prove intentional discrimination. Conversely, under a disparate treatment theory, Plaintiffs must show intentional race discrimination. To make out a prima facie case of intentional discrimination, they must show a connection between their race and the adverse employment *decision* being challenged in each case. Under such a theory, and in the absence of direct proof of intentional discrimination, Plaintiffs' proof would be examined against the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Unquestionably their burden would be higher.

This is not the first court to note disparate treatment claims parading under the guise of a disparate impact label. For example, in *Brooks v. Circuit City Stores, Inc.*, 1996 WL 406684 (D.Md.1996) (unreported), *reversed in part on other grounds*, 148 F.3d 373 (4th

Cir.1998), the proposed class plaintiffs sought certification of a class of African American job applicants from 1991 on and all present and former African American employees applying for managerial jobs. The plaintiffs also wished to challenge pay, promotion, transfer, discipline, and discharge policies, and alleged retaliation on a nationwide basis. In rejecting amendment of the pleadings to recognize such a class as futile, Judge Chasanow dismissed the plaintiffs' label of the case as raising "disparate impact" claims:

> Notwithstanding an isolated conclusory allegation of disparate impact, the gravamen of the complaint is one of disparate treatment. Plaintiffs purport to attack a particular policy or procedure at Circuit City that results in class wide discrimination—subjective decisionmaking. However, Plaintiffs do not and cannot allege that subjective decisionmaking itself is a practice that discriminates. Rather, they can only allege that it allows a situation to exist in which several different managers are able to discriminate intentionally. The focus of the claim remains the individual employment decisions.

1996 WL 406684 at 4. In sum, the nature of Plaintiffs' claims militate against a finding of commonality.

### (ii) Diversity of employment practices and site conditions

██ Turning to the second *Stastny* factor addressing diversity of employment practices and site conditions, the court concludes that although SRS is physically situated as a contained, one-site operation, its large size and unique organization render it more akin to the multi-facility operation at issue in *Stastny* than a one-plant operation.[7] SRS occupies approximately 321 square miles, containing operations from nuclear operations to firefighting to medical services to construc-

tion to janitorial services. The over 12,000 current employees are organized into 18 separate divisions, each of which maintains separate tiers of management, according to the affidavit of James Lander, Vice–President and Director of Human Resources. Four different employers operate at the site under a unique employee sharing agreement, discussed above.

Defendants' Addendum B, a tabular chart summarizing the Named Plaintiffs by Pay Grade, FLSA Status and Specific Employer, illustrates the diversity of Plaintiffs' occupations. The proposed class of over 4,000 African Americans would include the General Counsel of WSRC, day laborers, FLSA exempt employees, non-exempt employees, and union and craft members governed by a series of collective bargaining agreements. The affidavit of Linda Strickland, Labor Relations Manager for Bechtel, effectively details the myriad of unique evaluation, promotion and training programs applicable only to craft employees. Employee occupations at SRS are roughly categorized into nine EEO job categories containing over 60 different job groups. African Americans have occupied approximately 459 different jobs during the period of time covered by this proposed suit. Defendants' Tab 6 at 2.

In *Stott v. Haworth*, 916 F.2d 134 (4th Cir.1990), the Fourth Circuit found that a district court's certification of a class of state employees who alleged adverse personnel actions for political patronage reasons was improper. The court held that the employee positions were vastly divergent, and that the common question among all proposed plaintiffs was whether each plaintiff's position was one that was subject to patronage dismissal. *Id.* at 145. Although there are discernible differences noted by the Fourth Circuit between political patronage cases, in which

---

**7.** Having said this, the court does not wish to over-emphasize the importance it has placed on this factor, which the court finds to be of diminishing importance. Because of technological advances, not existing at the time of *Stastny*, workers sitting in offices in the same building are more likely to communicate with each other by electronic mail than by in-person or telephone contacts, and obstacles of distance have been largely eroded. Such technological advances

have to some extent diminished the importance of the multi-facility/single facility dichotomy so critical in *Stastny*, and in this court's opinion, the surviving vitality of *Stastny* hinges more on recognizing the importance of centralization of decisionmaking than on any other factor. Insofar as centralization of decisionmaking at SRS is evaluated, the situation is closely akin to what was at issue in *Stastny*.

some dismissals predicated on political reasons may be legal and some may not, and Title VII cases, in which all adverse employment actions predicated on race are illegal, *id.* at 143, the Fourth Circuit's examination of the multiplicity of jobs held by proposed class members in *Stott* is helpful to the present analysis. Noting that the plaintiffs held an array of positions with varied job descriptions, responsibilities and expectations, the court in *Stott* concluded that individual consideration of each plaintiff's claim was the only way to resolve the issues raised by the pleadings. *Id.* Recognizing this, the court concluded:

> [T]he case at bar presents no substantial facts or questions of law common or typical to all members of the certified class. We can find no commonality or typicality between the claims of each plaintiff that would propel this case through class treatment *when the positions held by each plaintiff were so divergent.* The only question common to each member of the class is whether or not his or her position was one that was subject to patronage dismissal. This question is in no way dispositive and simply propels the action into a posture where judicial scrutiny is necessary for just adjudication: scrutiny that requires a district court to do a case by case, position by position, activity by activity analysis of the First Amendment questions raised by the pleadings.... [T]he court [below on summary judgment motions] found it necessary to consider the claim of each plaintiff individually applying a "position-by-position analysis, taking into consideration both the description of the job, if there is one, and such other evidence as is available on the actual duties performed by the occupant." *We believe this to be proof positive that class disposition of this action is inappropriate.*

*Id.* at 145 (emphasis added). Similarly, in the present case the court finds, after having extensively reviewed the issues framed by the pleadings, that the only way to resolve each Plaintiff's claims is to conduct a case-by-case decision-by-decision inquiry, much like

that necessary in *Stott* and which defeated class certification. As was the case in *Stott,* the only common inquiry shared by all Plaintiffs is whether each suffered race discrimination. However, this shared question is insufficient to satisfy the commonality criteria of Rule 23.

Like the Fourth Circuit, many other courts have recognized that the necessity for individualized inquiry prevents commonality and typicality from being satisfied. *Reyes v. The Walt Disney World Co.,* 176 F.R.D. 654, 658 (M.D.Fla.1998) (typicality and commonality lacking where "each plaintiff or putative class member has his or her own set of unique circumstances surrounding the adverse employment action about which they now attempt to collectively complain.") *Gorence v. Eagle Food Centers, Inc.;* 1994 WL 445149 (N.D.Ill.1994) (unreported) (claims of discrimination in compensation, demotion and promotion were not typical of class as each claim was fact-specific).

The decentralization of the challenged decisions is a key factor underlying the necessity for individualized inquiries. Management of such a sprawling and complex array of employee tasks at SRS has required decentralization of decisionmaking. It is true that WSRC maintains a centralized Human Resources Division facilitating the operations of the employment policies. It is also true that this Division performs some centralized tasks, such as reviewing resumes and employee candidates' backgrounds to determine if the candidate satisfies the basic job requirements.[8] Beyond those functions, however, the evidence, unrefuted by Plaintiffs, shows that management of the employment practices challenged in this case is entrusted to direct supervisors and managers of the affected employee. Approximately 1,500 managers at SRS carry out the decisionmaking responsibilities affecting the proposed class members. Review of Plaintiffs' deposition extracts, Defendants' Addendum E, illustrates that Plaintiffs are in reality complaining about thousands of employment decisions made by at least several hundred different managers, each of whom exercised

---

8. It should be noted that this present suit does not seek to certify a class of proposed African American applicants for positions at SRS. Hiring practices are not challenged.

independent judgment in a way adverse to one (and possibly only one) Plaintiff. For example, of the 99 proposed class representatives, only 89 assert failure-to-promote claims. Those 89 Plaintiffs challenge 422 different promotion decisions. Those 422 decisions were made by hundreds of different managers, including, in some cases, other members of the proposed class.

The diversity of employment conditions, coupled with the sheer absence of evidence proving centralized decisionmaking for the types of decisions challenged in this suit, compels the court to find a lack of commonality under *Stastny* and other relevant law. In *Stastny*, the Fourth Circuit found that where, like here, promotion and pay decisions were entrusted to scores of different supervisors and managers, commonality was lacking under Rule 23, FRCP. Other cases have found centralized decisionmaking the pivotal factor. *See, e.g., Holsey v. Armour,* 743 F.2d 199, 216 (4th Cir.1984) (to have single class certified for promotion and hiring claims, the decisionmaker must be the same); *Jefferson v. Ingersoll, Int'l Inc.,* 1999 WL 669229 (N.D.Ill.1999) (lack of centralized decisionmaking one factor showing absence of commonality and typicality in race discrimination claim challenging hiring, compensation and promotions) (unpublished), *reversed in part on other grounds,* 195 F.3d 894 (7th Cir.1999); *Hewlett v. Premier Salons Int'l, Inc.,* 185 F.R.D. 211 (D.Md.1997) (commonality established in race discrimination claim based on evidence of company-wide policy to discriminate against African Americans by hair salon); *Brooks v. Circuit City Stores,* 1996 WL 406684 at 4 (D.Md.1996) (unpublished) (commonality lacking where subjective determinations of diverse factfinders would have to be examined); *Hopewell v. University of Pittsburgh,* 79 F.R.D. 689, 692–96 (W.D.Pa.1978) (commonality lacking where employment practices controlled by 300 budget units).

9. The court is aware that Plaintiff's Corrected Addendum 1, filed 3/28/00, presents much the same information, yet asserts that Plaintiffs challenge only a small number of the actual employment practices in effect during the relevant period. Even accepting Plaintiff's Addendum 1 as

### (iii) Diversity of membership class

The preceding analysis of the first two *Stastny* factors has overlapped with the third factor, diversity of the membership class and likelihood of common class questions. In a recent Fourth Circuit case, *Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331 (4th Cir.1998), the appeals court reversed a district court's certification of a class of franchisees suing a franchiser based on alleged misuse of advertising funds. The Fourth Circuit found commonality, typicality and adequacy lacking. The court's finding of an absence of common questions of law or fact and typicality was predicated on the fact that there were a number of different franchise agreement forms in use at various times and at issue in the suit, different alleged misrepresentations were made to different franchisees, the applicable defenses varied plaintiff-to-plaintiff, and the damages differed according to each franchisee's individual business circumstance.

The same inquiry directed at the present case yields similar results. As patently shown by Addenda A[9] and the affidavits of Linda Strickland and James Lander, a wide array of different employment policies have been in effect, many of which affect only segments of the proposed class. The multitude of adverse employment decisions undertaken by various direct supervisors and managers at issue here is comparable to the differing misrepresentations made to various franchisees in *Broussard.* Here, Defendants' defenses vary per claim, as Defendants claim that some Plaintiffs' claims are time-barred and that other Plaintiffs executed releases of any claims. Each defense would require individualized examination. In *Broussard* the Fourth Circuit found "when the defendant's 'affirmative defenses (such as ... the statute of limitations) may depend on facts peculiar to each plaintiff's case,' class certification is erroneous." 155 F.3d at 342 quoting *In re Northern Dist. of Cal. Dalkon Shield IUD Prods. Liab. Litig.,* 693 F.2d 847,

narrowing the field of challenged practices, it is clear that at least two evaluation systems, nine salary plans, and eight promotion/job posting plans are attacked, which precludes a finding of common employment practices for the class.

853 (9th Cir.1982).[10] The breadth of diversity as far as Named Plaintiffs' Individual Medical/Emotional Claims, Addendum F, illustrates that damages for each Plaintiff would also require individualized inquiry. For example, one Plaintiff claims high blood pressure and sexual dysfunction as a result of job-related stress, whereas another claims headaches, cramps, back pain, overeating, high cholesterol and weight gain as damages suffered. Thus, the court finds an absence of common questions.

The Fourth Circuit has made clear that certification of a single class is improper where different employment actions raising different issues of proof are at issue. *Holsey v. Armour & Co.,* 743 F.2d 199, 216 (4th Cir.1984) (cannot certify one hiring and promotion class); *Lilly v. Harris–Teeter Supermarket,* 720 F.2d 326, 334 (4th Cir.1983), *cert. denied,* 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 539 (1984) (single promotion/termination class disapproved where issues of proof were different). Throughout the briefing of Plaintiffs' motion for class certification, Plaintiffs consistently maintained that they wished this court to consider certification of only one class addressing all five of the challenged employment practices. Table 1 of Plaintiffs' February 28, 2000, Reply Memorandum suggested for the first time that the court could, if it found practicable, break out Plaintiffs' "omnibus" class (as described by Defendants) into three separate subclasses including exempt employees, non-exempt employees and craft employees. However, Plaintiffs' Reply Memorandum addressed these subclasses only in the context of being part of one overall class; Plaintiffs did not address what should happen if the court determined portions of their claims to be improper for certification. Only when pressed by the court at oral argument whether the court should rule on Plaintiffs' proposed class "straight up or down" did counsel for Plaintiff urge that the court could, if it were inclined, choose to certify subclasses.

It is clear to the court that the onus to ferret out the "certifiable" portions of Plaintiffs' claims from the "noncertifiable" portions of the omnibus class claims does not rest on this court. Nevertheless, to promote judicial efficiency the court has seriously considered whether portions of Plaintiffs' proposed class claims could be certified. The court finds that none of the proposed subclasses identified in Plaintiffs' Table 1 overcome the fatal deficiencies afflicting the larger proposed class: the diversity of jobs undertaken and decentralized management structure, coupled with the number of various employment policies in effect during the relevant time even within the same subclass, prevent the commonality criteria from being satisfied for any one of the proposed subclasses. Accordingly, the court finds a lack of common questions of law or fact among the membership of the proposed class or the three proposed subclasses identified by Plaintiffs.

**(iv) Centralization of decisionmaking**

The fourth *Stastny* factor concerning the nature of the management organization as it relates to the degree of centralization and uniformity of employment policies, has been previewed above. As to the evaluation process, Plaintiffs chiefly attack the IADP, a now discarded practice. Nevertheless, even when it was in use, the IADP did not affect half of the proposed class members who were within the nonexempt or craft classes of employees. The IADP process required each individual employee, in conjunction with her supervisor, to identify and record agreed-upon objectives for the year. These objectives reflect highly individualized, tailored choices related to the specific job. The IADP evaluation, completed by the immediate supervisor with approval by next level management, entails wholly decentralized decisionmaking at local levels. Thus, even when only one of the six different prevailing evaluation systems identified on Addendum

---

10. This court is aware that the First Circuit recently criticized *Broussard's* statement concerning the import of statute of limitations defenses in *Waste Management Holdings, Inc. v. Mowbray,* 208 F.3d 288, 296 n. 4 (1st Cir.2000). Nevertheless, even disregarding Defendants' assertion of affirmative defenses requiring unique proofs per Plaintiff, the court finds that Plaintiffs fail to satisfy the commonality criteria and adequacy of representation prongs of Rule 23(a), FRCP, for the numerous other grounds detailed herein.

A, the IADP, is considered, the decentralization and absence of uniformity are easily visible. The mere availability of higher level review of an IADP by senior management, upon specific challenge, does not of itself prove centralized control, but rather, as *Stastny* recognized, "tends rather to confirm a general pattern of local autonomy, with episodic review when specific challenges to local decisions were made." 628 F.2d at 279 n. 19.

As to Plaintiffs' compensation challenges, numerous salary administration plans governed during the relevant time period.[11] Even within the single class of exempt employees, closer examination reveals numerous salary plans, each calling for individualized assessment of the employee against factors like performance and salary history. In some years certain segments of the workforce were entitled to special increases, e.g., the 1997 engineering adjustments and the 1998 information technology professionals adjustments. As can be determined from the above, the 75 proposed class representatives raising salary claims challenge a multiplicity of salary policies, all of which were administered on a decentralized basis.

The hazardous job assignment claims are perhaps *sui generis*. At the outset, the court observes that only a fraction of the 99 proposed class representatives, 21 named Plaintiffs to be exact, assert job assignment claims. Of those 21 persons, only a tiny fraction assert alleged health problems stemming from actual radiation exposure. The claims of Plaintiff Moses Myers that he suffered psoriasis caused by radiation exposure or of Plaintiff Michael Staley that he suffered low white blood cell count, hair loss and headaches due to radiation exposure are extremely atypical. Rather, as Addendum F amply documents, the vast majority of these 21 Plaintiffs claim a wide variety of physical ailments caused by the stress of enduring the alleged discriminatory practices at the site.

It would be impossible for the named Plaintiffs to mount a broad-based class-wide hazardous assignments challenge as many do not work in jobs classified as radiologically-sensitive. Even where an employee's job is so classified, individualized inquiry would have to be undertaken to determine if race was a factor in the employee's initial or continuing assignment to the position. Defendants insist that some nonexempt African American employees, an even smaller subset of the 21 employees making hazardous assignment claims, have chosen to remain in certain radiologically-sensitive positions, notwithstanding their entitlement to transfer based on the exercise of seniority rights. This response points up, yet again, the necessity of individualized inquiry into each of the 21 Plaintiffs' claims. Any defenses, whether they be styled as "waiver of seniority transfer rights," or "failure to mitigate damages" dictate evaluation of a unique set of circumstances.

Decentralization and uniqueness of individual circumstance are also the hallmarks of the demotion/bustback claims, which affect only 22 of the proposed class representatives, who were demoted from exempt to nonexempt positions. To evaluate those decisions, it will be necessary to consider the demotion decision against the backdrop of the then-prevailing reduction-in-force guidelines, and the individual Plaintiff's work performance. Moreover, it will be necessary to evaluate the decision against the records of those allegedly comparable employees who were not "busted back."

As to the last of the five challenged employment practices, training assignments, it is clear that those decisions are also determined on a decentralized basis. Aside from the training opportunities that are mandatory for certain jobs, optional training assignments are assigned by direct supervisors based on a variety of needs and factors. To determine if discriminatory assignments

---

11. The exact number is a matter of hot debate with Plaintiffs claiming that Defendants have counted as separate salary plans annual salary increases that did not modify basic salary structures. Even giving Plaintiffs the benefit of the doubt on this argument, at a minimum at least six different basic salary plans governed: project agreement (craft employees), compensation practices for nonexempts, management position salary plans, exempt position salary plans, Professional Job Review Programs for SOPs and some exempts, and the Rank Performance Pay Process (RP3).

were made, it will be necessary to examine the composition and qualifications of the attending class against those persons who now allege they were qualified for yet denied opportunities for training. It must also be determined that the disappointed trainees made clear their wishes for training in the specific area. Again, these, too, are highly individualized inquiries, leading the court to conclude that the nature of the employment practices challenged in the case are decentralized managerial decisions reflecting little in common with one another.

Such comparative analysis necessitated by the five types of challenged employment practices further defeats suitability for class certification. In *Boley v. Principi*, 144 F.R.D. 305, 308 (E.D.N.C.1992), *aff'd sub nom. Boley v. Brown*, 10 F.3d 218 (4th Cir. 1993), the district court denied certification because the unique factual differences in plaintiff's claim eroded proof of typicality of claims, which, as shown above, is the second element of the commonality criteria. Similarly, the court in *Gorence v. Eagle Food Centers, Inc.*, 1994 WL 445149 (N.D.Ill.1994), found a lack of typicality where the multitude of compensation, demotion and promotion decisions required comparison of the subject plaintiff with an allegedly preferred comparator. Where, as here, Defendants' pleadings assert legitimate, nondiscriminatory reasons for each challenged action that is specific to that individual Plaintiff, this court knows of no way to resolve the plethora of diverse employment actions challenged by these 99 named Plaintiffs (even ignoring the thousands of others in the putative class) without simply "rolling up the sleeves" and tackling them one-by-one. Such an approach ensures fairness for each Plaintiff by preventing her claim(s) from being lost in the shuffle and for each Defendant by ensuring that it is not fighting thousands of mini-trials against the composite "perfect plaintiff" addressed in *Broussard.*

■ To a large extent Plaintiffs' argument attacking the subjectivity of the employment practices is a frank admission by Plaintiffs that SRS pursues a decentralized management structure in which the vast majority of employment decisions are determined by direct supervisors and next-level managers with no actual influence from higher management. Several courts have recognized that the mere incantation of the *Falcon* subjectivity exception is insufficient to prove a centralized management decision to engage in discrimination. As the court in *Sperling v. Hoffmann–La Roche, Inc.*, 924 F.Supp. 1346, 1363 (D.N.J.1996), observed in rejecting the plaintiffs' pattern-or-practice subjectivity argument:

> [T]he consequences of finding that plaintiffs' claim fits within the pattern-or-practice framework would be that anytime a company gives managers discretion to make employment decisions that company potentially engages in a pattern or practice of discrimination. This is because anytime managers are given discretion they have the opportunity to exercise that discretion in a discriminatory manner. Thus, some may discriminate, while others may not. However, concluding that this situation, without more, is a pattern or practice would bring within the definition of a pattern or practice employment practices that were not intended to be there. This is because a decision by a company to give managers the discretion to make employment decisions, and the subsequent exercise of that discretion by some managers in a discriminatory manner, is not tantamount to a decision by a company to pursue a systematic, companywide policy of intentional discrimination, i.e., a pattern or practice of discrimination.

In *Betts v. Sundstrand Corp.*, 1999 WL 436579 (N.D.Ill.1999), the plaintiffs sought certification of a hiring class of African American employees, who claimed, in part, that defendant employed "word of mouth" discriminatory and subjective hiring practices. In finding that the commonality criteria were not satisfied, the court observed:

> [A] disparate impact claim can be based on *entirely* subjective employment practices. However, where there are objective factors, even a generally subjective process will not satisfy Rule 23's commonality and typicality requirements. Here, while defendant's hiring practices allow for a certain amount of subjectivity, the managers

are not completely unfettered. For example, the interview evaluation form contains objective inputs, such as education and training, and areas of technical competence, and the company uses job descriptions.

1999 WL 436579 at 6. *See also Bostick v. SMH (US) Inc.,* 1998 WL 934642 at 5 (N.D.Ga.1998) (unreported) ("[p]roof that the Defendant considers subjective factors in making personnel decisions is not sufficient alone to establish a prima facie case of systemic gender based discrimination"), citing *Casillas v. United States Navy,* 735 F.2d 338, 345 (9th Cir.1984); *Abrams v. Kelsey–Seybold Med. Group, Inc.,* 178 F.R.D. 116, 132 (S.D.Tex.1997) (where there are objective factors, even a generally subjective process will not satisfy Rule 23's commonality and typicality criteria).

In the present case, examination of Defendants' evaluation, promotion, salary and demotion policies reveals that objective factors are to be considered and addressed by the direct supervisors involved in the specific employment decision. Plaintiffs' attempts to show otherwise fall short. For example, Plaintiffs' Addendum 2 is a condensed summary of "subjective" criteria affecting promotions and salary increases. From 1991 to 1994 the relevant criterion for employee promotions was demonstrating an ability, over an extended period of time, to perform higher level work successfully. From 1995 to the present the criteria are to demonstrate "the knowledge, skill and ability (over an extended period) to successfully perform the responsibilities of the higher level job." The more recent standard focuses the decision on a balance of three independent factors: the employee's knowledge, skill, and ability, viewed over time, to perform the higher level job in a successful manner. This is no mere off-the-cuff guess or crystal-ball reading, but is a job-related guideline calculated to ensure that only qualified persons occupy the higher level positions. The court rejects any contention that Defendants' employment practices are *entirely* subjective. Doubtless some degree of subjectivity permeates each decision but Defendants have circumscribed the decisionmaker's operating room.

Moreover, it appears what subjectivity remains is limited. For example, the 1999 promotions criterion for movement from one grade level in the same job family to another, as also depicted in Plaintiffs' Addendum 2, requires demonstration of the following:

1) Work at the higher level is available, required in the unit, and can be assigned to the employee;

2) The employee has demonstrated the knowledge, skill and ability (over an extended period) to successfully perform the responsibilities of the higher level job;

3) The employee meets all the minimum qualifications for the new position, including cumulative years of experience. Typically, employees must meet time-in-grade requirements; however, time-in-grade alone should not initiate a promotion nor should it hinder advancement for experienced employees who meet all other job requirements.

For promotions from individual contributor to management or to individual contributor positions outside their immediate job family, employees must qualify for the position by meeting the minimum qualification and competency requirements.

Under the foregoing promotions criteria, a host of relevant objective factors guide the decisionmaker's decision. There is no evidence of unfettered decisionmaking across the proposed class [12] within the meaning of the *Falcon* exception. Thus, Plaintiffs' commonality proof must rest on something more substantial.

Nor is Plaintiffs' certification claim assisted by their statistical reports. Plaintiffs' statistical reports fail to demonstrate satisfaction of the commonality criteria because of critical deficiencies in their composition. As was the case in *Stastny,* the statistical reports submitted by Plaintiffs are aggregated

---

12. The court is aware that a few of the challenged employment programs, such as the Detail Foreman Promotions program, contain no listed criteria for advancement. Plaintiffs' Addendum 4. This program governs only craft employees covered by special agreements, as described in the affidavit of Linda Strickland. Plaintiffs here, however, seek certification of a broad-based class in which craft members' claims must satisfy the commonality criteria with other class members.

across divisions and across classes of employees. Plaintiffs' statistics ignore vital differences such as differing employee status (exempt, nonexempt, SOP, or craft), and ignore experience, requirements for jobs, and available interested and qualified pools of employees from which to draw. Such aggregated statistics fail to "reveal whether there is a pattern of disparities across the various decisionmaking units or a reliable sample of them," *Stastny*, 628 F.2d at 278, and are of scant utility to the court in conducting a certification analysis. *See also Griffin v. Dugger*, 823 F.2d 1476, 1490 n. 32 (11th Cir.1987), *cert. denied*, 486 U.S. 1005, 108 S.Ct. 1729, 100 L.Ed.2d 193 (1988) ("In light of *Falcon*, general statistical evidence of underrepresentation in the workforce will undoubtedly not suffice to justify a single class covering different types of discrimination such as in hiring, promotion, and discharge.").

### (v) Similarity of conditions during relevant period

The last *Stastny* commonality factor asks whether similar conditions have prevailed throughout the period. As has been repeatedly discussed above, a multitude of diverse employment policies prevailed during the relevant five year period spanned by this suit. Plaintiffs' Addendum 1 admits this much. Even a single employee in one class may have been subjected to a number of different salary administration plans over the five year period and may have several claims, each predicated on a different plan. Plaintiffs' proposed class encompasses the claims of longstanding employees who have experienced numerous shifts in employment policies, the claims of short-term employees only briefly touched by SRS policies, and the claims of future employees who may be affected by current policies. The duration of the proposed class claims cuts against a finding of static conditions and satisfaction of this *Stastny* commonality element.

Having applied each of the *Stastny* factors to the evidence, the court finds that Plaintiffs' proposed class (even with its three suggested subclasses) fails to satisfy the Rule 23(a) commonality criteria in this Circuit.

### D. Adequacy of Representation

██ In order to prevail on their motion for class certification, Rule 23(a)(4) requires that Plaintiffs be in a position to fairly and adequately protect the interests of the proposed class members. This is a two-pronged inquiry, requiring evaluation of: (1) whether class counsel are qualified, experienced, and generally able to conduct the proposed litigation; and (2) whether Plaintiffs' claims are sufficiently interrelated with and not antagonistic to the class claims as to ensure fair and adequate representation. *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211, 218 (D.Md.1997).

No genuine dispute is mounted as to proposed class counsel's qualifications and this court finds no obstacles to satisfaction of the first-prong of the adequacy inquiry. However, Defendants raise several challenges that several Plaintiffs' claims are antagonistic to claims of other class members or that conflicts of interest exist within the proposed class.

██ Defendants contend that the fact that the proposed class includes both African American individuals claiming discrimination and African American supervisors or managers who allegedly effectuated the discriminatory employment decisions is an irreconcilable conflict within the class. Approximately 25% of SRS supervisors and 13% of SRS managers are members of the proposed class. Three challenged programs, including the IADP, the Competency Based Job Posting Program, and the Non–Exempt Upgrade Program, were administered by African Americans.

Examination of Plaintiffs' deposition excerpts reveals that several Plaintiffs complain of race discrimination perpetuated by other African Americans. For example, Plaintiffs Johnny King and Tonia Williams both claim their direct supervisor, an African American, discriminated against them, and several other Plaintiffs charge that George Harley, the former Director of Human Resources Division and a proposed class member, and Tom Habersham, another African American who served as head of the EEO Office at WSRC, discriminated against them.

Defendants also point to potential conflicts inherent in a class in which many putative class members competed with other class members for one promotion or training opportunity. Several Plaintiffs are claiming race discrimination from such denials notwithstanding that the opportunity may have, in fact, been awarded to another African American. This is the case with Plaintiffs Marvin Moore, Pamela Wade, and George Bush, all of whom "lost out" on certain opportunities to other putative class members. Insofar as Plaintiffs' Third Amended Complaint requests make-whole injunctive relief in the form of,

> [d]irecting defendants to place plaintiffs in the positions they would have been in but for the discriminatory and wrongful treatment of them, and making plaintiffs whole for all earnings, compensation and benefits they would have received but for defendants' discriminatory actions, including, but not limited to, wages, commissions, bonuses, pension credits, and other lost benefits, together with interest thereon;

the court finds serious conflicts within the composition of the proposed class. In addressing the adequacy of representation criteria, the Supreme Court in *General Tel. Co. of the Northwest v. EEOC*, 446 U.S. 318, 331, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980), recognized that, "[i]n employment discrimination litigation, conflicts might arise, for example, between employees and applicants who were denied employment and who will, if granted relief, compete with employees for fringe benefits or seniority. Under Rule 23, the same plaintiff could not represent these classes." If the court were to grant the injunctive relief requested, it is obvious that, for example, Plaintiffs who are "made whole" with respect to salary adjustments and promotions will be competing against other putative class members for benefits such as wages, bonuses, and pension credits as well as for seniority rights in the case of craft employees. An award to some Plaintiffs will necessarily adversely impact other Plaintiffs.

In *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 404–05, 97 S.Ct. 1891, 52 L.Ed.2d 453, the Supreme Court recognized another fatal conflict thwarting Plaintiffs' attempts to prove adequacy of representation for class certification. The Court found a critical flaw in the "conflict between the vote by members of the class rejecting a merger of the city- and line-driver collective bargaining units, and the demand in the Plaintiffs' complaint for just such a merger." *Id.* at 404–05, 97 S.Ct. 1891. Similarly, here segments of the proposed class advocate different positions as to several of the challenged employment policies. Plaintiff Curtis Coker, Jr. claims he was illegally "busted back" whereas Plaintiff Clinton Edwards, Jr. claims that the bustback policy saved him from being terminated in a reduction-in-force. Assignment to radiologically-sensitive or "hot" positions is also a matter of some debate among segments of the proposed class, with some class members claiming they wish to be transferred out of a "hot" position while others claim they wish to remain in "hot" jobs.

Recently in *Broussard* the Fourth Circuit found the district court ignored glaring conflicts of interest in certifying different groups of current and former franchisees in one class. Some plaintiffs wanted relief in the form of personal damages whereas others sought restitution to an account. The court held that the remedial "interests of those within the single class are not aligned." *Id.* at 338 quoting *Amchem Products Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). For much the same reasons, the court concludes that the remedial interests of the diverse Plaintiffs here are not aligned within the proposed class and that, therefore, the named Plaintiffs are not adequate representatives of the proposed class within the meaning of Rule 23(a)(4).

### E. Rule 23(b)(2) and (b)(3) Requirements

In order to propose a class meeting Rule 23 requirements, Plaintiffs would also have to demonstrate that one of the conditions of Rule 23(b), FRCP, is met. Plaintiffs contend that certification is appropriate under Rule 23(b)(2), or as a "hybrid" (b)(2)/(b)(3) case. Rule 23(b)(2) requires that:

> the party opposing the class has acted or refused to act on grounds generally applicable to the class thereby making appro-

priate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

Rule 23(b)(2) certification is inappropriate where, as here, the final relief sought relates "exclusively or predominately to money damages." *Zimmerman v. Bell,* 800 F.2d 386, 389 (4th Cir.1986). Examination of Plaintiffs' Third Amended Complaint and Defendants' Addendum F convinces the court that the primary relief sought by Plaintiffs is not injunctive relief, but rather is substantial individualized compensatory and punitive damages flowing primarily from the "stress" endured by the class members in working in an alleged discriminatory environment. To the extent that any injunctive relief is sought, that relief will be available to each individual Plaintiff upon proper proof in her individual case.

Certification of a "hybrid" class action requires satisfaction of both the (b)(2) and (b)(3) requirements. *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 420–23 (5th Cir. 1998) (refusing to certify hybrid class, based in part, on Seventh Amendment problems). Even if Plaintiffs could satisfy (b)(2), the court finds that the (b)(3) prong is unsatisfied here.

 As to certifications under (b)(3), the court must find:

> that the questions of law or fact common to the members of the class predominate over any question affecting only individual members, and that the class action is superior to other available methods for a fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interests of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in a particular forum; (D) the difficulties likely to be encountered in the management of the class action.

Rule 23(b)(3), FRCP. The predominance of common questions of law or fact requirement of Rule 23(b)(3) is far more stringent than

the commonality requirement of Rule 23(a). *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 623–24, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Because Plaintiffs here have failed to satisfy the lesser showing required under Rule 23(a), they cannot satisfy Rule 23(b)(3)'s requirements.

Applying Rule 23(b)(3), the Eleventh Circuit in *Jackson v. Motel 6 Multipurpose, Inc.,* 130 F.3d 999 (11th Cir.1997), *rehearing denied,* 167 F.3d 542 (11th Cir.1998), reversed a district court's certification of a class action claiming race discrimination in the rental of hotel rooms. The court rejected any finding of predominance:

> [T]he single common issue in the *Jackson* case—whether Motel 6 has a practice or policy of discrimination—is not rendered predominant over all the other issues that will attend the *Jackson* plaintiffs' claims by the fact that class treatment of these claims may be more efficient and uniform than case-by-case adjudication. Instead, "as a practical matter," the resolution of this overarching common issue breaks down into an unmanageable variety of individual legal and factual issues."

*Id.* at 1006 (citations omitted). The same type of fact-specific inquiries that thwarted establishment of predominance in *Jackson*—a need to determine if the plaintiff was rented or denied a substandard room, whether there were vacancies at the time, whether there were non-racial reasons prompting the rental of a substandard room, and whether the plaintiff was denied a room for non-racial reasons—would apply in the instant action to determine if, for example, Plaintiff X was improperly denied training on account of race discrimination, or Plaintiff Y was denied a promotion because of racial animus. Plaintiffs cannot establish (b)(3) predominance in the proposed class. Accordingly, Plaintiffs' motion for class certification must be denied.

## VII. CONCLUSION

The court is firmly convinced that certification of Plaintiffs' proposed class is not supported by governing United States Supreme Court cases, as exemplified in *Falcon,* and by Fourth Circuit law, as expressed in *Stastny*

and *Broussard*. "Across the board" challenges relying on "disparate impact" labels and statistical summaries do not satisfy the requirements of Rule 23, Fed.R.Civ.P. Here, *not one single named Plaintiff* in the proposed class asserts claims involving all of the programs attacked;[13] rather, the pattern is one of combinations and permutations of some Plaintiffs on some claims and different combinations and permutations of Plaintiffs on other claims, etcetera. Certifying the proposed class would create the composite "perfect plaintiff" who possesses an interest in every disputed program administered over a five-year period under the five challenged employment practices. In order for a class certification to proceed, the class representative must be a part of the class and possess the same interest and suffer the same injury as the class members. *Broussard*, 155 F.3d at 337. This purely fictional "perfect plaintiff" representative would, however, bear no likeness to any one of the real Plaintiffs in this case. For this reason, the court must deny Plaintiffs' motion.

At oral argument Plaintiffs' counsel stated that his clients sought "justice" through their class certification motion. The court can assure Plaintiffs that each of their individual claims will receive careful and tailored scrutiny by this court. Each Plaintiff will have a day in court notwithstanding the denial of the certification motion.

Accordingly, IT IS THEREFORE ORDERED that Plaintiffs' Motion for Class Certification is DENIED. Plaintiffs' related Motion to Bifurcate Class Liability Issues is MOOT in light of the court's finding that Plaintiffs' proposed class-action does not satisfy Rule 23(a), or Rule 23(b)(2) or (b)(3), FRCP. Defendants' Motion to Strike Plaintiffs' Request for Class–Wide Punitive Damages is also MOOT.

IT IS FURTHER ORDERED that Defendants' Motion to Strike the Ivan D. Smith Declaration and Ray McClain Declaration is PARTIALLY GRANTED, PARTIALLY DENIED. Defendants' Motions to Strike

the Jinna J. Shin Affidavit, and "Calhoun Study" are DENIED.

IT IS FURTHER ORDERED that the *Lott* and *Walker* cases shall no longer be consolidated. Individual Civil Action Numbers shall be assigned to each named *Lott* Plaintiff whose claims are set forth in Plaintiffs' Third Amended Complaint, filed May 25, 1999. Thereafter all 99 cases shall proceed on an individual basis. Plaintiffs shall have thirty (30) days from the filing date of this order in which to file Fourth Amended Complaints for each of the 98 *Lott* Plaintiffs and Plaintiff Walker. The Fourth Amended Complaints shall identify each specific claim(s) and each Defendant(s) to be sued on each claim. Thereafter, within the time limits provided by the Federal Rules of Civil Procedure, Defendants shall file an answer or otherwise respond to each Fourth Amended Complaint.

IT IS SO ORDERED.

---

**13.** Obviously, no single plaintiff could have an interest in the multiple programs and policies within the five employment areas challenged in the case, as several programs apply only to certain classes of employees, e.g., exempts, and it is unlikely any one plaintiff could have occupied exempt, nonexempt, craft and SOP status within a limited five-year period.